631 So.2d 491 (1994)
Edna GUILFORE, Wife of/and Julian Guilfore
v.
D.H. HOLMES CO., LTD., et al.
No. 93-CA-0076.
Court of Appeal of Louisiana, Fourth Circuit.
January 13, 1994.
*493 Lawrence A. Arcell, Barker, Boudreaux, Lamy & Foley, New Orleans, for plaintiffsappellees.
Kenneth B. Krobert, Borrello, Huber & Dubuclet, Metairie, for defendants/appellants.
C. Edgar Cloutier, III, Richard J. Garvey, Jr., Christovich & Kearney, New Orleans, for defendant/appellee, Otis Elevator Co.
Before CIACCIO, ARMSTRONG, PLOTKIN, JONES and WALTZER, JJ.
PLOTKIN, Judge.
The issue in this appeal is whether the plaintiff, Edna Guilfore (Guilfore), proved a defect in the escalator owned by defendant, D.H. Holmes (Holmes).
Guilfore instituted both a La.C.C. art. 2315 tort suit and a La.C.C. art. 2317 strict liability suit against Holmes; it insurer, Liberty Mutual Insurance Company (Liberty); and Otis Elevator Co. (Otis), the company which manufactured, installed, and maintained the escalator. Holmes third partied Otis for indemnification and/or contribution. The jury dismissed the negligence cause of action against all defendants. Thereafter, the jury found that the escalator was defective and assigned the following percentages of fault: Holmes, 70 percent, Guilfore, 30 percent, and Otis, 0 percent. The jury awarded Guilfore $136,126.25. Holmes and Liberty appeal, raising two assignments of error:
1. The law charge as to the requirements for proof of a defect was incorrect, which caused the jury to err in concluding that the escalator was defective.
2. The denial of Holmes' cross claim against Otis was error.

Recovery in strict liability
In order to recover in strict liability under La.C.C. art. 2317, the injured person must prove the following: (1) that he was injured by a thing, (2) that the thing was in the defendant's custody, (3) that there was a vice or defect creating an unreasonable risk of harm in the thing, and (4) that the injured person's damage arose from that danger. Spott v. Otis Elevator Co., 601 So.2d 1355 (La.1992); Ross v. LaCoste deMonterville, 502 So.2d 1026 (La.1987). The plaintiff has the burden of proving the three requirements of custody, defect, and causation.
There can be no La.C.C. art. 2317 liability for an injury unless the thing is defective. The plaintiff must establish a defect in the thing, and must establish that the defect creates an unreasonable risk of harm. The Supreme Court has established unambiguous jurisprudence to determine whether a La. C.C. art. 2317 "defect" exists. In Entrevia v. Hood, 427 So.2d 1146 (La.1983) the court framed the test as follows:
1. Is there a vice or defect in the thing?
2. If there is such a defect, does it pose an "unreasonable risk of harm to another?
The court explained the second inquiry as follows:
The unreasonable risk of harm criterion, however, is not a simple rule of law which may be applied mechanically to the facts of a case. It is a concept employed by this court to symbolize the judicial process required by the Civil Code. Since articles 2317 and 2322 state general precepts and not detailed rules for all concrete cases, it becomes the interpreter's duty to decide which risks are encompassed by the codal obligations from the standpoint of justice and social utility....
The judicial process involved in deciding whether a risk is unreasonable under article 2317 is similar to that employed in determining whether risk is unreasonable in a traditional negligence problem, Hunt v. City Stores, Inc., 387 So.2d 585, (La. 1980) and in deciding the scope of duty or legal cause under the duty/risk analysis. Hill v. Lundin Associates, Inc., 260 La. 542, 256 So.2d 620 (1972); Green, The Causal Relation Issue, 60 Mich.L.Rev. 543, 563 (1962). This is not because strict liability under article 2317 is equivalent to *494 liability for negligence, but because in both delictual areas the judge is called upon to decide questions of social utility that require him to consider the particular case in terms of moral, social and economic considerations....
Id. at 1149, citing Entrevia, 427 So.2d at 1149-50.

Evidence of a defect
Plaintiff claims that the jury properly found, based on the following facts, that the escalator at Holmes was defective because it presented an unreasonable risk of harm.
Otis manufactured and, in August 1970, installed an escalator in Holmes department store in Houma, Louisiana; the escalator served the first and second floors. Otis entered into a maintenance-service contract with Holmes which was in effect on the date of the accident.
The escalator at Holmes is a set of moving stairs, whose movements are precisely controlled by an electric motor connected through gears, sprockets and chains. As the escalator approaches the top or bottom, the steps flatten and form a horizontal surface, and disappear through a "comb."[1] Adjacent to the comb is the floor plate, the first step off or on the escalator. It is located on the same level as the floor of the building. The operating controls for the up escalator are located under the first floor plate.
Holmes' escalator rises a distance of 38 feet between the first and second floors at a 30-degree incline. The motor that moves the escalator is called an AC Squirrel Cage induction motor. It is designed to operate at a single constant speed of 60 cycles per second power. This causes the escalator to move at 90 feet per minute or 1 m.p.h. If the speed of the escalator changes, the equipment is designed to automatically shut down.
On March 25, 1985, Guilfore, her husband, Julian Guilfore[2] and a cousin, Helen Wilkes,[3] entered the Holmes store. After shopping on the first floor, Guilfore decided to proceed to the second floor to purchase a T.V. set. She attempted to convince Wilkes to ride the escalator with her, but Wilkes refused because she was afraid of all escalators. Mr. Guilfore also lagged behind, but Guilfore searched for him and convinced him to join her. He was four or five steps behind her as they proceeded up to the second floor.
At trial, seven years after the accident, Guilfore testified that she waited for her husband and Helen Wilkes, then said "I hurry up and get on the elevator," while talking to Mrs. Wilkes. One customer behind her separated her from her husband. She first testified that approximately midway up the stairs "it kind of act funny again, then it snatch like," which she described as a jerk. Later in her testimony, she stated that the first jerk occurred at the top of the escalator, that she experienced a total of three jerks, and that she fell down as she was stepping off the escalator onto the second floor and was thrown onto the second floor. She claimed that the escalator was going "a little faster than it normally does or what you had seen before."
The accident report taken the same day reflects that Guilfore stated "that she fell back after stepping off the escalator and hit her head on the floor. That she was looking backward talking to a friend when she stepped off the escalator, she fell backwards." There is no mention of any defect or abnormal operation of the escalator.
After Guilfore completed the accident report, she purchased a T.V. and proceeded to her chiropractor, Dr. Leslie Walker. Dr. Walker documented the history of her injury as follows: "She had fallen backwards on some stairs at Holmes" and sustained various injuries. Dr. Walker referred her to Dr. Dexter A. Gary, an orthopaedist who examined her on April 15, 1985. Dr. Gary documented *495 the history of the accident, as relayed by Guilfore, as follows:
The patient reported that on March 28, 1985, that she had fallen while on an escalator going up at the D.H. Holmes store in Houma, La. She reported that she didn't see the last step. That she was talking to her husband and that when the escalator hit the top of its run, that she stumbled forward and she fell.
On April 22, 1985, Guilfore voluntarily gave a telephone-recorded statement to a Liberty adjuster. She said that as she was proceeding to step off the escalator onto the second floor when she fell either because her foot became hooked in the stairs or because she was thrown off the escalator because it was running fast.
Mr. Guilfore, who admitted that he has significant memory lapses, said that he was standing a few steps behind his wife on the escalator and noticed that she turned sideways as she was stepping off the escalator onto the second floor, when she fell down. He said that before he boarded the escalator it looked like it was going a little faster than it is supposed to go, but not twice as fast as normal. He said the stairs jerked and threw his wife off at the top of the escalator.
Carleen Conley testified that she and her mother were proceeding toward the escalator on the first floor to the second floor when the accident occurred. There were two or three people ahead of her, but she looked up and saw Guilfore approximately midway up the escalator. She noticed Guilfore reach the second floor, when she fell backward toward the ground floor onto the second floor. However, Ms. Conley stated twice thereafter that she did not witness Guilfore's fall, but that she saw her on the ground. She opined that the escalator was "going real fast, or twice as fast," although she never boarded the escalator on the day of the accident. She immediately left the store without identifying herself as a witness. A year later she volunteered to be a witness when she met the plaintiff in a store.
Gloria Livas also testified that she approached the up escalator and was behind Ms. Conley and another person on the first floor. She first observed the plaintiff about four steps from the second floor landing and saw her trip over something, which she described as a 10-inch opening or gap between the steps. Ms. Livas said that Guilfore fell halfway onto the second floor. She claimed that two moving steps separated 10 inches at the second floor, creating a hole on the steps as it went through the comb. She saw that the escalator suddenly started moving faster than normal and making a cranking sound. Like Ms. Conley, Ms. Livas never boarded the escalator, and she admitted that she left the store without identifying herself as a witness. Approximately one year and several months later, she met Guilfore at a washateria and agreed to testify on her behalf.
Otis called three witnesses. Russell Drinnon, the Otis district manager and supervisor of the Holmes Houma store, identified the maintenance contract and explained the maintenance procedure, saying that an Otis maintenance mechanic visits the Holmes store every other week. The mechanic first interviews a store representative to determine whether there are any problems, reported or unreported, with the escalators. Next, the mechanic is required to ride the escalator in order to determine for himself whether there are any noise or defects in the escalator's operation. His final normal duty is to go into the escalator controls to inspect and lubricate them. The mechanic completes a route sheet indicating the maintenance performed and secures a Holmes' employee signature when the work is completed. Otis' business records reflect the bi-week maintenance service calls, the last one prior to the accident on March 13, 1985, as well as a maintenance inspection on March 28, 1985. There is no evidence in these records, before or after the accident, that there was anything wrong with the escalator in this store.
Additionally, Otis provides a callback service to Holmes. When a customer reports a problem with the Otis equipment between inspections, Otis records the complaint and then dispatches a service mechanic to repair the equipment.
Otis' business records, including callbacks, for the escalator involved in this case, reflect only three entries prior to the accident. On *496 October 12, 1984, the escalator would not move; it was repaired and returned to service. On October 26, 1984, the comb plate was damaged when something fell on it; it too was repaired. On February 27, 1985, during a regular maintenance inspection, a floor plate on the second floor was repaired. Based on the business records, which Guilfore does not challenge, there is no evidence of any defective condition in the Holmes up escalator on or before the March 25, 1985 accident. There is no evidence from any witness that any of these conditions caused or could cause the escalator to operate faster than normal, create a jerky motion, or cause steps to separate.
Mr. Hugh Lilly, the Otis mechanic assigned to the Holmes Houma Store, also testified. He confirmed that he performed the bi-weekly inspection and callback procedures. He testified that the two callbacks and routine maintenance repairs had nothing to do either with the speed of the escalator or with any possible jerking of the steps. Additionally, Lilly stated, none of the problems documented could have caused a step separation. At the last inspection, prior to the accident, on March 13, 1985, the up escalator was operating properly, Mr. Lilly stated.
Mr. David Steel, an Otis employee, was accepted as an expert witness in the design and operation of escalators. He testified that the escalator is designed to operate at a constant speed, and that the equipment in the escalator is regulated by codes. The escalator motor can only operate at a set speed of 1 m.p.h. and could not have sped up as the plaintiff and her witnesses testified. Further, there could not be a step separation or gap, because the machinery is precisely designed and manufactured. If such an occurrence did happen, the escalator would automatically shut down. Finally, an escalator can only jerk when something abnormal happens and there would be some evidence of damage or equipment failure. Mr. Steel concluded that no defect which caused the plaintiff to fall existed in the up escalator because there was no evidence of any damage to the equipment, no evidence of any equipment failure or defect, no evidence of repairs reported or made after the accident, and no evidence that the escalator shut down.
Holmes presented no evidence, but adopted the evidence offered by Otis.

Jury charge
The trial judge gave the following jury charge on the La.C.C. art. 2317 strict liability:
With respect to this lawsuit, you should also consider the theory of strict liability. This theory of law applies only to the defendant, D.H. Holmes and not to Otis Elevator.
Under the theory of strict liability, when injury results from a defect in a thing which creates an unreasonable risk of harm to others, the party legally responsible for the custody of that thing may be held liable for the damage thus caused, despite the fact that no personal negligent act or inattention on the party's part is proved. The liability arises from the legal relationship to the thing which creates an unreasonable risk of harm to others.
Under this theory, the plaintiff must prove that the thing in question was defective. That it posed an unreasonable risk of harm. And that the plaintiff need only prove this by showing an unusual occurrence. Plaintiff must show that she was damaged as the result of this defect.
Both Guilfore's claim and the charge to the jury are based on the premise that proof of an unusual occurrence and accident is sufficient to raise an inference that a vice or defect creating an unreasonable risk of harm existed in the "thing," relieving the plaintiff of the burden of independently proving the existence of a defect. For the reasons discussed below, this premise is not supported by the applicable Louisiana law, making the jury charge incorrect.
The so-called "sudden occurrence" test for proving a defect was first expressed in an escalator strict liability case. Marquez v. City Stores Inc., 371 So.2d 810 (La.1979). In that case, a 3½-year-old child's tennis shoe got caught in the escalator moving tread. The court reasoned that a defect existed because of the unusual occurrence of the *497 accident.[4] It held that the defense evidence was insufficient to rebut the inference that there was a vice or defect in the escalator. See also Brown v. Sears, Roebuck & Co., 514 So.2d 439 (La.1987), in which a two-year-old child's finger became caught in the moving threads of an escalator. The court in that case said that "a defect may be inferred from the circumstances of the accident." Id. at 444.
However, the results in Marquez and Brown are dictated by the special care accorded to children and the paternalism that courts have employed to protect them from injuries. However, in Spott, 601 So.2d 1355, the Supreme Court recognized the distinction between cases in which children's hands and feet were caught in escalators and cases where discerning adult users were injured, making the "unusual occurrence" rule inapplicable to the second type of cases. When minors are injured by a vice in a structure, Marquez and Brown stand for the principle that a defect may be inferred from the proof of an unusual occurrence; however, proof of an unusual occurrence does not correlate to proof of a defective thing in every case.
In fact, the "unusual occurrence" test as proof of a defect has been rejected by various courts. For example, in Broussard v. Pennsylvania Millers Mutual Ins. Co., 406 So.2d 574 (La.1981), a La.C.C. art. 2317 action was brought against the owners of an aquarium for injuries a child sustained when the aquarium's stand turned over, causing the aquarium to fall on the child. The plaintiff contended that a defect must be presumed from the fact of the accident. The court said there was no defect, and hence no La.C.C. art. 2317 liability, stating as follows:
Plaintiffs contend that a defect must be presumed from the fact of the accident. It is argued that the toppling of the aquarium stand was "an unusual occurrence" which would not have happened if the item had not been defective. Marquez v. City Stores Co., 371 So.2d 810 at 813 (La. 1979).... A defect cannot be solely inferred from the fact that the accident occurred.

Broussard, 406 So.2d at 576. (Emphasis added.)
In Spott, a case involving a strict liability claim against Otis for an alleged defective elevator, the court said that "defects are not presumed to be present by the mere happening of an accident." Id., 601 So.2d at 1364.
Perhaps the most dramatic demonstration of the limitations of the unusual occurrence doctrine for raising an inference of the existence of a defect is found in this court's recent opinion in Hughes v. Green, 609 So.2d 991 (La.App. 4th Cir.), writ denied 612 So.2d 82 (La.1993). In that case, we affirmed a trial court judgment in favor of the landlord in a strict liability case, even though the plaintiff tenant had proved that the ceiling in her apartment had indeed fallen down. Although the falling of a ceiling is obviously a dramatic "unusual occurrence," the court found that the plaintiff failed to meet her burden of proving that the occurrence was caused by a defect in the ceiling, and thus was not entitled to recover under a strict liability theory. Under the rule presented in the Hughes decision, a plaintiff in a strict liability case is not entitled to rely on a inference that an unusual occurrence was caused by a defect in the thing. In order to recover in strict liability, the plaintiff must offer some direct or circumstantial proof of the existence of a defect.
Certainly proof of the happening of an "unusual occurrence" would be sufficient circumstantial evidence in some cases to prove a defect. However, the jury charge in this case indicates that such evidence is always sufficient, under all circumstances. As demonstrated by the above discussion of the applicable law, the instruction was misleading, not because such proof is never sufficient, but because the instruction allowed the jury to rely on an inference that proof of an unusual occurrence is always enough.
The instructions given to the jury in this case did not reflect the correct applicable *498 law since they allowed the jury to infer a defect in the escalator from the fact that the accident occurred, without consideration of other circumstances which impact upon the case. The correct instructions for the definition of a defect that creates an unreasonable risk of harm should have been derived from the risk versus social utility balancing process, as defined in Entrevia, 427 So.2d 1146i.e., should this defendant be liable to this plaintiff for this harm caused in this manner? Moreover, the trial court's legal error in charging the jury prejudiced the defendant and affected the jury verdict.
A trial judge has a duty to give instructions which properly reflect the law applicable in light of the facts of a particular case. Barnett v. New Orleans Public Service, Inc., 489 So.2d 452, 455 (La.App. 4th Cir.1986). In order to fulfill that duty, he must both require that the jury consider only the correct law and avoid confusing the jury. Cuccia v. Cabrejo, 429 So.2d 232, 235 (La. App. 5th Cir.), writ denied 434 So.2d 1097 (La.1983). Thus, we reverse the jury verdict and undertake a de novo review of the record. Rosell v. ESCO, 549 So.2d 840 (La. 1989); Picou v. Ferrara, 483 So.2d 915 (La. 1986); Gonzales v. Xerox Corp., 320 So.2d 163 (La.1975).

De novo review
All the witnesses to the accident confirm that Guilfore fell as she was stepping off the escalator onto the second floor, either while looking backwards or turned sideways. On the date of the accident, she failed to mention any defect in the escalator in the accident report. This fact is confirmed by the history she gave to her two physicians. The history she reported to Dr. Gary indicates that she fell because she was talking to her husband and did not see the last step.
The first report of any defect in the escalator is the plaintiff's statement to the adjuster on April 22, 1985, one month after the accident, when she said that she fell either because her foot became hooked in the stairs or because the escalator was running too fast. Other evidence of a defect was presented in the testimony of Ms. Conley and Ms. Livas. Ms. Conley thought the escalator was going twice as fast as normal, but never rode the escalator. Ms. Livas thought the escalator was traveling faster than normal and that a 10-inch gap in the stairs opened which caused the plaintiff to fall; she never boarded the escalator. Both of these witnesses were discovered more than one year after the accident.
We find that the above evidence, which is all circumstantial, was sufficient to carry the plaintiff's burden of proving a prima case that the escalator in question was defective. Once the plaintiff presented all this circumstantial evidence, the burden then shifted to the defendant to disprove any defect.
Mr. Lilly, who inspected Holmes escalators regularly under the maintenance contract with Otis, found the escalator in proper working condition both before and after the accident. A thorough, past-incident examination of the escalator revealed no problems or repairs. If the escalator had sped up, it would have automatically shut down, according to the only expert witness, Mr. Steel. There is no evidence that this occurred and there is no evidence that the escalator was restarted. Moreover, no evidence was presented by anyone, pre or post accident, except by Ms. Livas, that a 10-inch step separation occurred on one occasion. If such a major step separation occurred, it would have been discoverable after the accident. The Otis maintenance records reflect that the escalator was operating normally and properly before and after the accident.
We find this evidence, presented by the defendants was sufficient to overcome the plaintiff's prima facie case that she fell because of a defect in the escalator. Considering all the evidence presented at trial together, it is apparent that the plaintiff fell because she failed to see and step onto the second floor, not because of a defect in the escalator for which Holmes is liable. The evidence presented by the defendant is clear that the accident could not have been caused by a problem with the escalator.[5]

*499 Conclusion

Accordingly, the trial court judgment in favor of the plaintiff is reversed and judgment is entered in favor of the defendants, Holmes and Liberty.
REVERSED AND RENDERED.
WALTZER, J., dissents with written reasons.
WALTZER, Judge, dissenting.
This is an appeal from an April 1, 1992 judgment rendered against defendants D.H. Holmes and its insurer, Liberty Mutual, finding in favor of the plaintiffs Edna and Julian Guilfore. Edna Guilfore was injured on March 28, 1985 while riding an escalator owned by and located in D.H. Holmes in Southland Mall, Houma. The judgment granted plaintiffs damages in the amount of $125,000.00 for general damages and $11,126.25 for past medical expenses, all reduced by 30% negligence attributable to Edna Guilfore, plus legal interest and costs. Judgment was further granted against the plaintiffs, Edna and Julian Guilfore and in favor of defendant Otis Elevator, dismissing Otis. From that judgment, D.H. Holmes and Liberty Mutual appeal.
On appeal defendants raise two specifications of error:
1. The trial court improperly charged the jury as to the requirements for proof of a defect, and the jury committed legal error in finding that the escalator was defective.
2. The trial court committed legal error when it denied the cross-claim of D.H. Holmes and Liberty Mutual Insurance Company against Otis Elevator.
Turning to the first specification of error, the jury returned the following answers to the jury interrogatories:

 1. Was Otis Elevator negligent? No.
 (Skip to 3.)
 3. Was D.H. Holmes negligent? No.
 (Skip to 7.)
 7. Was the escalator defective? Yes.
 8. Did the defect cause or contribute to
 any injuries sustained by the plaintiff?
 Yes.
 9. Did the plaintiff's conduct cause or contribute
 to the injuries sustained by her?
 Yes.
10. Please state the percentage of negligence
 or fault, if any attributable to
 D.H. Holmes, Otis Elevator Company
 and Edna Guilfore. (Note that the total
 of your percentage must be 100%.)
 D.H. Holmes 70%
 Otis Elevator 0%
 Edna Guilfore 30%
 ______
 Total 100%
11. Please state what sum of money, if any,
 that would reasonably and fairly compensate
 Edna Guilfore for:
 General Damages $125,000.00
 Past Medical Expenses 11,126.25

Additionally, the trial court charged the jury in pertinent part as follows:
In resolving the issues of liability in this case, there are certain rules of law that you must consider. There are two theories of recovery applicable to this case. The first theory is that of negligence which applies to both D.H. Holmes and to Otis Elevator.
* * * * * *
With respect to this lawsuit, you should also consider the theory of strict liability. This theory of law applies only to the defendant D.H. Holmes and not to Otis Elevator.
Under the theory of strict liability, when injury results from a defect in a thing which creates an unreasonable risk of *500 harm to others, the party legally responsible for the custody of that thing may be held liable for the damage thus caused, despite the fact that no personal negligent act or inattention on the party's part is proved. This liability arises from the legal relationship to the thing which creates an unreasonable risk of harm to others.
Under this theory, the plaintiff must prove that the thing in question was defective. That it posed an unreasonable risk of harm. And that the plaintiff need only prove this by showing an unusual occurrence. Plaintiff must also show that she was damaged as the result of this defect.
If the plaintiff proves these things by a reasonable preponderance of the evidence, the person in custody of the thing in question can escape liability only if it shows that the injured party or that the injuries were caused by the plaintiff herself.
One of the defenses which the law permits a party in custody of a thing which poses an unreasonable risk of harm to raise is that the injured person was herself at fault and thereby helped cause her own injury. If you conclude that the plaintiff's conduct in this incident was a substantial deviation from the conduct we would normally expect of a reasonably prudent person or that the plaintiff fully understood the danger which was involved and then voluntarily exposed herself to the danger, then you must allocate the percentage of fault as between D.H. Holmes and Mrs. Guilfore.
On this defense, the defendant has the burden of proof and must convince you by a reasonable preponderance of the evidence.
With respect to damages, ...
The main thrust of defendants' first specification of error is:
Appellants contend that the jury was not sufficiently apprised of its role in this case by the Trial Court. In order to find the escalator defective, the jury would have to consider two issues. The first issue was whether a defect existed in the escalator. The second issue was whether the defect constituted an unreasonable risk of harm... The jury charge did not explain to the jury what an unreasonable risk of harm meant.
I find that the trial court erred in failing to explain the concept of "unreasonable risk of harm" to the jury. Where, as in the present case, trial court legal errors have tainted the factfinding process, the verdict below is not reviewed under the manifest error standard and, if the record is complete, the appellate court may make a de novo review of the record and determine the preponderance of the evidence. Rosell v. ESCO, 549 So.2d 840, 844 fn. 2 (La.1989); Gonzales v. Xerox Corp., 320 So.2d 163 (La.1975); Moore v. Clark, 517 So.2d 293, 302 (La.App. 1st Cir.1987); McLean v. Hunter, 495 So.2d 1298 (La.1986); Picou v. Ferrara, 483 So.2d 915 (La.1986); Otto v. State Farm Mut. Ins. Co., 455 So.2d 1175 (La.1984); Suhor v. Gusse, 388 So.2d 755 (La.1980); Ragas v. Argonaut Southwest Ins. Co., 388 So.2d 707 (La.1980).
At trial plaintiff presented three live eye witness fact witnesses to the accident. Carleen Conley testified that the escalator was moving abnormally fast, approximately twice normal speed, that the escalator jerked and threw Mrs. Guilfore onto the second floor, and that Mrs. Guilfore had her hand on the handrail during the ride. Gloria Livas testified that the escalator was traveling at a faster than normal speed and was making a cranking or grinding sound. She further testified that there was a 10 inch opening at the top of the escalator where the floor plate would normally be and that she saw 2 steps move away from each other revealing the 10 inch gap. Mrs. Guilfore testified that the escalator was moving at an abnormally rapid rate of speed, that it jerked and threw her to the ground.
To contradict the three witnesses testimony, D.H. Holmes did not present eye witness testimony to the contrary. Holmes seemed to primarily rely upon testimony by Otis' witnesses Russell Drinnon, Hugh Lilly and Dave Steel. Russell Drinnon, the Otis Houma manager, noted that Hugh Lilly maintained the escalator at issue. Drinnon reviewed Lilly's route sheets and testified therefrom. He noted that the floor plates, which are approximately 10 inches, are removable, *501 and noted prior repairs which had been done to the floor plates as well as prior repairs to the chain for clanking noises. Lilly testified that there are two types of service calls, routine once a year maintenance done by Otis schedule and callbacks by the customer when there is trouble. In reviewing the written service history of the escalator at issue, Lilly was asked if there was a callback on the day of the accident. He responded, "I don't see one." In the course of Drinnon's prior testimony, it was discovered that there are two escalators in the store, one up and one down and that some service notations for the other escalator had been made on the wrong sheet by the repair men. Both sheets were not introduced, raising a doubt that perhaps a service notation for the escalator at issue had been made on the wrong and unintroduced service maintenance history sheet. Lilly testified that he had routinely serviced the escalator on March 20, 1985, 8 days before the accident, and that it was operating normally at that time. Dave Steel is Otis's Manager of Escalator Codes and Product Safety. Steel testified that the escalator uses a squirrel cage alternating current induction motor to power the chain which moves the steps and that the motor is only capable of moving at one speed, therefor the escalator could not have increased speed. He further testified that the chain is manufactured in such a manner that it could slip from the track, giving rise to the clanking and step separation complained of. The majority opinion incorrectly states the "If the speed of the escalator changes, the equipment is designed to automatically shut down." This is an incorrect statement of the testimony which was that if the speed of the motor changes, then the motor is designed to automatically shut down. As noted by the majority, the electric motor is connected to the moving stairs through gears, sprockets, and chains. As the energy is transferred from the motor to the chains and then to the stairs, the speed of the escalator can change because of the condition of the chain, even though the motor has not increased in speed. In such a case, the escalator would not automatically shut off. In fact, the escalator at issue had already had such a problem and its chains had already been changed once as a result.
The majority opinion also erroneously states that "There is no evidence in these records, before or after the accident, that there was anything wrong with the escalator in the store," and "Based on the business records, which Guilfore does not challenge, there is no evidence of any defective condition in the Holmes up escalator on or before the March 25, 1985 accident," while at the same time reciting the prior repair problems on October 12, October 26, and February 27th. The maintenance sheet indicates there had indeed been past problems with this escalator. Further the majority's statement that "There is no evidence from any witness that any of these conditions caused or could cause the escalator to operate faster than normal, create a jerky motion or cause steps to separate" ignores the testimony of Otis's Manager of Escalator Codes, Dave Steel that the chain is manufactured in such a manner that it could slip from the track, giving rise to the clanking and step separation complained of.
D.H. Holmes presented no liability witnesses of its own. All of the liability witnesses were presented by either plaintiffs or Otis.
Based on the evidence and testimony presented, the jury could easily have found the plaintiffs' witnesses more credible and found that the rapid speed, jerking, clanking and 10 inch gap constituted an unreasonable risk of harm. It is clear that the escalator's malfunctions are an unreasonable risk of harm, thus no definition of unreasonable risk of harm was necessary. But even if this court found that such a definition was necessary, the jury reached a correct result in applying the definition of unreasonable risk of harm to the actions of the escalator, thus any error would be merely harmless error. This specification of error is without merit.
Turning to the second specification of error, defendants allege that the trial court erred in failing to grant its cross claim against Otis. D.H. Holmes presented virtually no evidence against Otis. The main thrust of its defense seemed to be, if the elevator had been malfunctioning, we would have called Otis to service it, but there is no *502 evidence that we called Otis to service the escalator, therefor it wasn't broken and alternatively, since Otis manufactured, installed, and maintained the escalator, they should be liable. The jury found that neither D.H. Holmes nor Otis were negligent and found liability under the provision of Civil Code Article 2317 which states: "We are responsible, not only for the damage occasioned by our own act, but for ... the things which we have in our custody." The escalator was in the custody of D.H. Holmes, the jury found it was defective and was the cause of plaintiffs injuries. The jury did not find Otis responsible in any manner. A review of the Otis-D.H. Holmes contract indicates that there is no provision providing indemnification from Otis to D.H. Holmes. The contract specifically provides:
It is agreed that we do not assume possession or control of any part of the equipment but such remains yours exclusively as the owner (or lessee) thereof. We shall not be liable for any loss, damage or delay due to any cause beyond our reasonable control including, but not limited to, acts of government, strikes, lockouts, fire, explosion, theft, floods, riot, civil commotion, war, malicious mischief or act of God. Under no circumstances shall we be liable for consequential damages.
D.H. Holmes has not argued, but this court notes that the Otis contract also contains the following provision:
We agree ... to maintain the original contract speed in feet per minute ...
Because the escalator doubled its usual speed while Mrs. Guilfore was on it, Otis failed to maintain the original contract speed in feet per minute at the time of the accident in breach of its contract with D.H. Holmes. See: Coleman v. Otis Elevator Co., 582 So.2d 341 (La.App. 4th, 1991) writs not applied for. The majority opinion states "The dissent would hold Holmes liable for Ms. Guilfore's injury on the basis of a provision in the contract between Holmes and Otis which the dissenting judge interprets as an indemnification agreement". This is a completely incorrect statement. I would hold Otis liable to plaintiffs and to Holmes under a breach of contract theory, namely contract speed in feet per minutes which was breached when the escalator sped up. The majority opinion further erroneously states that it finds the contract speed provision irrelevant "Since the jury found that the escalator was operating at the proper speed when the accident occurred." The jury found that the escalator was defective in interrogatory Number 7. The jury found that the escalator had sped up. Accordingly, the trial court erred in denying the reconventional demand. We note that D.H. Holmes specifically appealed the denial of the reconventional demand, that Otis has filed an appellee brief on this issue and that the issue is properly before this court. I further note that paragraph 4 of D.H. Holmes' reconventional demand specifically pleads the contract and breach of contract, thus the issue is properly in the record before us. I note that the jury only found on the two tort issues, negligence and strict liability and did not find on the contract issue. I find that Otis breached its contract in failing to maintain the original contract speed in feet per minutes at the time of the accident. Accordingly, I find that the trial court erred in dismissing D.H. Holmes' reconventional demand and would amend the judgment below to so reflect.
The majority opinion engages in a lengthy discussion of the "sudden occurrence" doctrine. Dissenter believes that the "sudden occurrence" doctrine does not apply in the instant case, nor is it necessary in light of the eyewitness and expert defense testimony which the jury found in interrogatory 7 indicated that the escalator was defective.
Turning to the majority's section entitled "De Novo Review", I note that the Supreme Court recently stated in Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993):
The discretion vested in the trier of fact is "great", and even vast, so that an appellate court should rarely disturb an award of general damages.
The scope of appellate review is whether the trier of fact, in this case the jury, was manifestly erroneous in its factual determinations. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Rosell v. ESCO, 549 So.2d 840 (La.1989); Stobart v. *503 State, 617 So.2d 880 (La.1993); Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La. 1993).
It is not enough that in the opinion of a reviewing court the trier of fact be merely erroneous, but rather manifestly erroneous. The majority opinion seeks to substitute its own opinion for that of the trier of fact, namely, the jury, without the jury's advantage of seeing the demeanor of the witnesses in assessing credibility. The jury simply believed different witnesses than the majority opinion does. Not only was the jury not manifestly erroneous in its determinations in the instant case and not only was it not merely or somewhat erroneous, but the jury was correct in its factual determinations and the jury verdict and award should be upheld.
Before a Court of Appeal can disturb an award made by a trial court, the record must clearly reveal that the trier of fact abused its discretion in making its award. Coco v. Winston Industries, Inc., 341 So.2d 332, 335 (La. 1976). It is only after analysis of the facts discloses an abuse of discretion, that the award may on appellate review, for articulated reason be considered excessive or insufficient. Reck v. Stevens, 373 So.2d 498, 501 (La.1979). The appellate court can disturb the award "only to the extent of lowering it (or raising it) to the highest (or lowest) amount which is reasonably within the discretion afforded that the court." Coco, 341 So.2d at 335.
Lastly, this case points to a fundamental inequity that continues to be tolerated in our law. In this country there are very few escalator/elevator companies. While the escalator/elevator companies all design, manufacture, install and maintain the equipment, their contractual language consistently relieves them of all responsibility for the thing which they create and maintain. The store owner when constructing a store is not in an equal bargaining position with the escalator industry. If the store owner wants an escalator in his store, which is a commercial necessity, he must accept the escalator company's terms. It is fundamentally unfair that the store owner is continuously held liable for the actions or inactions of the escalator/elevator industry. Should the Louisiana or National Retailers Association or the Louisiana or National Shopping Center Association attempt to draft new legislation or start a model contract program with its members? Should the monopolistic language of the escalator/elevator industry contracts be explored? This writer does not know, but clearly something needs to be done.
For the reasons discussed, I would amend and affirm as follows:
To order judgment herein in favor of Edna Guilfore and against D.H. Holmes Co., Ltd. and Liberty Mutual Insurance Company, and Otis Elevator Corporation, jointly, severally and in solido in the sum of $125,000.00 for general damages and $11,126.25 for past medical expenses, (but reduced by 30% which is the negligence attributable to Edna Guilfore) with legal interest from date of judicial demand until paid, and for all costs; and to order further that D.H. Holmes, Liberty Mutual Insurance Company, and Otis Elevator Company be cast for a witness fee in favor of Dr. Dexter Gary in the amount of $200.00 and to Dr. Leslie Walker in the amount of $200.00.
NOTES
[1] The comb has a "teeth" appearance that permit the steps to circulate under the floor and reappear.
[2] Julian Guilfore was deceased at the time of the trial, but his deposition was read to the jury and is in evidence.
[3] Helen Wilkes was afflicted with a non-defined mental and physical illness and did not testify.
[4] The reasoning in this case has been criticized because it creates absolute liability against the guardian. Stablier v. City of Baton Rouge, 393 So.2d 148 (La.App. 1st Cir. 1980); Canty v. Terrebonne Parish Police Jury, 397 So.2d 1370 (La. App. 1st Cir. 1981).
[5] The dissent would hold Holmes liable for Ms. Guilfore's injury on the basis of a provision in the contract between Holmes and Otis which the dissenting judge interprets as an indemnification agreement. We do not address this issue because of our finding that the evidence presented by the plaintiffs in this case is insufficient to prove a defect in the escalator manufactured by Otis and owned by Holmes; thus, neither Holmes nor Otis has any liability for plaintiff's injuries. However, we note that the provision cited by the dissent is not an indemnification agreement; it is simply an acknowledgment that Holmes was given "garde" of the escalator when it was installed in the store. Nowhere in the provision does Holmes agree to be responsible for liability on the part of Otis. The dissent would also hold Otis liable for Ms. Guilfore's injuries on the basis of a provision in the contract making Otis responsible for maintaining the speed of the escalator. However, we find that provision irrelevant to this case since the jury found that the escalator was operating at the proper speed when the accident occurred. Furthermore, we find no manifest error in that finding.