641 So.2d 1022 (1994)
Johnnie Mae TOWNSEND and Donald Townsend
v.
WESTINGHOUSE ELEVATOR CORPORATION, et al.
No. 25966-CA.
Court of Appeal of Louisiana, Second Circuit.
August 17, 1994.
*1023 Richie & Richie, by Byron A. Richie, Mayer, Smith & Roberts, by Alex S. Lyons, Shreveport, for plaintiffs-appellants.
Lunn, Irion, Johnson, Salley & Carlisle by Gerald M. Johnson, Shreveport, for defendant-appellee, Westinghouse.
Mayer, Smith & Roberts by Alex S. Lyons, for defendant-appellant Arkla, Inc.
Before LINDSAY and HIGHTOWER, JJ., and WESTERFIELD, J. Pro Tem.
HIGHTOWER, Judge.
In the chief aspects of this case, plaintiff spouses appeal a district court judgment rejecting their claims, after the wife allegedly sustained injuries while entering an elevator. We affirm.

*1024 BACKGROUND
Arkla Exploration, Inc., a solely-owned subsidiary of Arkla, Inc. ("Arkla"), employed Jonnie Mae Townsend at a downtown Shreveport office building maintained by the parent company. When the employee stepped into an elevator there on June 24, 1987, the floor of the device slightly "dropped" and caused her to stumble, an account confirmed by the only other occupant of the elevator. Although she caught herself and did not fall, Townsend claims the sudden movement jarred her body and caused serious back injuries. The incident occurred when the elevator stopped at the tenth floor, after descending from the twelfth floor.
Townsend and her husband subsequently sued the elevator manufacturer and the maintenance contractor, Westinghouse Electric Corporation and Westinghouse Elevator Company (hereinafter collectively referred to as "Westinghouse"), as well as the building owner, Arkla, asserting theories of strict liability and negligence. The wife's employer intervened to recover worker's compensation benefits paid her. Additionally, Arkla filed a cross-claim against Westinghouse for contribution and/or indemnity under its service agreement.
In a written opinion, the district judge found that plaintiffs did not prove that a vice or defect in the elevator presented an unreasonable risk of harm, or that defendants had been negligent in their maintenance. Upon the signing of judgment dismissing all demands and claims, this appeal ensued.

DISCUSSION

Unreasonable Risk of Harm
In their first assignment of error, plaintiffs argue that the trial court erred in failing to find that a vice or defect in the elevator presented an unreasonable risk of harm. This contention is without merit.
When strict liability and negligence are urged as alternate grounds of recovery in such a case, the difference between the two concepts reposes in the proof that each demands. Either theory requires the plaintiff to prove 1) the defendant had custody of the thing causing the injury; 2) the thing contained a "defect" (i.e., a condition creating an unreasonable risk of harm); and 3) the "defective" condition caused the plaintiff's injury. Oster v. Dept. of Trans. & Dev., 582 So.2d 1285 (La.1991); Pool v. City of Shreveport, 607 So.2d 861 (La.App. 2d Cir.1992); Barnes v. New Hampshire Ins. Co., 573 So.2d 628 (La.App. 2d Cir.1991). Under a negligence approach, the plaintiff must additionally prove the owner or custodian knew or should have known of the "defect;" whereas, under strict liability, the plaintiff is relieved of that burden as such knowledge is presumed. Id. Under either theory, however, the lack of an unreasonably dangerous condition implies the absence of a duty on the part of the defendant. Oster, supra.
Inasmuch as the trial court in the present case never reached the issue of custody or causation, the critical question presented for review is whether the elevator created an unreasonable risk of harm. That inquiry, designed to balance the likelihood and magnitude of harm against the utility of the "thing," entails a myriad of social, moral, and economic values which are considered within the framework of the facts and circumstances of each individual case. Socorro v. City of New Orleans, 579 So.2d 931 (La. 1991); Entrevia v. Hood, 427 So.2d 1146 (La.1983); Pool, supra. Similar to the duty-risk analysis, it must be determined whether allowing recovery to the particular plaintiff involved, for damages occurring in the particular manner in which the plaintiff sustained injury, is desirable from the standpoint of justice and the social utility of the conduct of the respective parties. Oster, supra. More specifically, such an approach will not result in every party with garde over property being responsible for every injury that happens to occur on his premises. Id.
Both Townsend and the other witness to the accident testified that the elevator "dropped" approximately six to twelve inches as Townsend entered. However, elevator operation and maintenance experts, called by both sides, explained that the car could not have stopped more than three inches below floor level. A greater interval, they indicated, would have caused the elevator to proceed *1025 very slowly to the basement or bottom floor. Consequently, the trial judge rejected the lay explanations and relied instead upon expert accounts of how the event occurred. Factual determinations, of course, may not be set aside on appeal in the absence of manifest error or clear wrongness. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
Premised upon their conclusion that the elevator stopped with a small differential in compartment/building floor levels, the experts suggested that the dropping sensation resulted from the difference in elevation or from the car subsequently moving slightly to relevel itself automatically. This explanation appears consistent with the occupant's statement that the elevator had been "either moving or just finishing moving" as Townsend stepped in. The major dissention between the experts, however, stemmed from their evaluations concerning why the elevator initially failed to align perfectly.
Plaintiffs' expert, Robert Cosgrove, felt that a "slowdown" switch (designed to reduce the speed of the car to twelve feet per minute before reaching the stopping point) malfunctioned and allowed the elevator to proceed to the lower edge of the leveling zone (plus or minus three inches from the building floor).[1] He thus theorized that, with the door beginning to open and Townsend entering, the elevator continued downward before stopping no more than three inches below the building floor. Hence, this witness explained, the "dropping" sensation probably resulted from this downward movement or upon the car automatically realigning with the landing as permitted under the elevator safety code.
In Cosgrove's opinion, the failure of a slowdown switch constitutes a mechanical malfunction which will intermittently recur until repaired. Yet, the maintenance records failed to reflect any similar problems, before or after the incident, or any remediations. Furthermore, cross-examination disclosed that Cosgrove had not carefully examined the schematic diagrams of the elevator, and, instead, based his conclusions on the limited description of the event provided by Townsend and the other occupant. Apparently, his only inspection of the scene involved a ride in the elevator about five years after the occurrence.
Westinghouse's expert, Ray Pohlman, concluded that Townsend, waiting directly in front of the doorway to the elevator, entered as soon as the doors began to open but before the machine completed its leveling functions. Consequently, the normal movements would have caused a "dropping" sensation. Pohlman further stated that a misalignment as great as three inches, though allowed by the safety code, could only result from a "double failure of switches" with a probability of occurrence at about once every six to ten years. Continuing, he explained that the normal operation of the releveling mechanism corrects these types of isolated incidents which, even with the best care, are virtually impossible to avoid in advance. Had the slowdown switch failed, as contended by Cosgrove, the faster speed (approximately ten times greater than for normal stopping) would almost surely have been obvious to the passenger. Pohlman also observed that the elevator functioned constantly after the incident and that maintenance records depicted no similar problems.
Our review of the record indicates that, in concluding the elevator did not present an unreasonable risk of harm, the trial judge correctly analyzed the evidence. First, the two experts clearly indicated that the machine had been operating within applicable safety regulations promulgated by the American National Safety Institute. Although not definitive in assessing liability, such standards provide guidelines for gauging whether a condition presents an unreasonable risk of harm. Bowles v. Litton Industries, Inc., 518 So.2d 1070 (La.App. 5th Cir.1987). Second, the evidence preponderates that the effect experienced by Townsend resulted from ordinary leveling operations. *1026 Cf. Spott v. Otis Elevator Co., 601 So.2d 1355 (La.1992); Jolly v. Otis Elevator Co., 620 So.2d 497 (La.App. 4th Cir.1993) (both finding no liability in situations where elevators dropped suddenly due to the normal functioning of a safety system). The mere happening of an accident does not necessarily prove a defect. Spott, supra; Guilfore v. D.H. Holmes Co., Ltd. 93-0076 (La.App. 4th Cir. 1/13/94), 631 So.2d 491. This is especially true where the probability of the occurrence is very low and the machinery involved is designed to protect against such an event. Finally, in the present circumstances, a party who pauses briefly before entering the elevator, and quickly evaluates the surroundings, will likely avoid such an incident entirely.
Considering all of the evidence, and as the trial judge found, it is apparent that the elevator in question did not create an unreasonable risk of harm. Plaintiffs, therefore, under either strict liability or negligence, and against any of the defendants,[2] failed to prove an essential element of their claim.

Maintenance
Plaintiffs also contend that the trial judge erred in finding neither Arkla nor Westinghouse negligent in their operation and maintenance of the elevator. In particular, they argue that a party responsible for elevator maintenance should be held to the same high degree of care imposed on a common carrier.
Similar to the determination in Spott, supra, however, we conclude that under either standard, whether that of a common carrier or a reasonable person, liability would not attach.[3] Westinghouse responded promptly to Arkla's repair requests, and the building supervisor had been well satisfied with the maintenance provided. Service personnel visited the facility almost every day, while Arkla kept a complete list of all reported complaints. The building owner also conducted daily inspections in order to promptly discover any problems. The only documented difficulties involved mechanical "stepping" occurrences, which the contractor eventually resolved and which the technical witnesses agreed had no connection to the incident in question.
While insisting that absent improper maintenance the elevator would have leveled without a "jarring" effect, plaintiffs' expert nonetheless found Westinghouse's remediation procedures better than normal. Furthermore, the Townsends presented no other indications of negligence by Westinghouse or Arkla. Instead, they relied upon Cosgrove's opinion derived from a brief inspection of the facilities and his limited reference to the pertinent schematics and diagrams. Of course, the effect and weight to be given such testimony depends upon the underlying facts and, also, rests within the broad discretion of the trial judge. Middle Tenn. Council, Inc. v. Ford, 274 So.2d 173 (La.1973); Winford Co., Inc. v. Webster Gravel & Asphalt, Inc., 571 So.2d 802 (La.App. 2d Cir. 1990).
In light of the insufficient evidence of negligent maintenance and more than adequate rebuttal of any showing in that regard, we find this assignment of error without merit.

Res Ipsa Loquitur
In another assignment, plaintiffs contend the trial court should have applied the doctrine of res ipsa loquitur. This argument also lacks merit.
Res ipsa is a rule of circumstantial evidence which allows an inference of negligence if the facts indicate that the alleged tortfeasor's negligence, more probably than not, caused the injury. However, in that negligence is not generally presumed, the concept must be sparingly applied. Thus, it *1027 may obtain when three requirements have been met: 1) the circumstances surrounding the accident are so unusual that, in the absence of other pertinent evidence, there is an inference of negligence on the part of the defendant; 2) the defendant had exclusive control over the thing causing the injury; and 3) the circumstances are such that the only reasonable and fair conclusion is that the accident resulted from a breach of duty on the defendant's part. Spott, supra; Wilson, supra note 3. Obviously then, the plaintiff must initially prove facts which warrant the inference. Id.
Our review of the record discloses that plaintiffs failed to show the circumstances here to be so unusual as to meet the first criterion allowing application of res ipsa. To the contrary, and as stated, the evidence preponderates that Townsend's "dropping" sensation occurred as a result of the normal leveling functions of the elevator. Plaintiff's expert, with little reference to the maintenance records or design plans, merely speculated that a switch failure transpired and could have been caused only by faulty maintenance. Moreover, even if the doctrine applied, we conclude that Westinghouse and Arkla adequately rebutted any presumption of negligence by showing they properly serviced the system. The testimony of Pohlman indicated that even the closest scrutiny will not detect random malfunctions of such equipment, and that the leveling mechanism is engineered to rectify such occurrences. Cf. Spott, supra (involving the normal functioning of a safety device).

Other Assignments of Error
An answer, by Westinghouse, and a "protective" appeal, by the building owner and employer, set forth other assignments of error. These, however, pose issues not reached by the trial court and similarly mooted by our previous determinations.

CONCLUSION
For the reasons assigned, we affirm the district court's judgment rejecting all demands and claims. Costs of the appeal are assessed to plaintiffs.
AFFIRMED.
NOTES
[1] Rule 210.1e of the American National Standard Safety Code For Elevators, Dumbwaiters, Escalators, and Moving Walks establishes a leveling zone extending three inches above and three inches below any landing, and, to facilitate releveling, authorizes movement of an elevator within that area with the doors open. The Westinghouse expert indicated that these boundaries had been substantially narrowed in 1986 from a prior margin of thirty inches.
[2] Although the parties dispute whether Arkla or Westinghouse had garde over the object in question, our finding that the elevator did not present an unreasonable risk of harm obviates any discussion of the issue.
[3] In both Rosell v. Esco, 549 So.2d 840 (La. 1989), and Spott, supra, our supreme court pretermitted such an issue. The fourth circuit, in similar cases, has held that an elevator maintenance contractor owes only a duty to exercise reasonable care in the performance of services under its agreement with the building owner. See Brown v. Otis Elevator Co., 535 So.2d 525 (La.App. 4th Cir.1988); Wilson v. Hibernia Nat'l Bank, 517 So.2d 1206 (La.App. 4th Cir.1987), writ denied.