796 So.2d 19 (2001)
Renee HEBERT
v.
Donald PARKER, M.D., Mercy + Baptist Medical Center k/n/a Memorial Medical Center, State of Louisiana, Through the Louisiana Health Care Authority, the Medical Center of Louisiana at New Orleans, Pendleton Memorial Methodist Hospital, et al.
Lucinda Barth
v.
Donald Parker, M.D., State of Louisiana, Through the Louisiana Health Care Authority, the Medical Center of Louisiana at New Orleans, Laura G. Sporl, M.D., Kevin Plaisance, M.D., and Leonard Wall, M.D.
Nos. 2000-CA-0686 and 2000-CA-0687.
Court of Appeal of Louisiana, Fourth Circuit.
May 23, 2001.
Amended on Rehearing September 25, 2001.
*22 Joseph W. Thomas, New Orleans, Counsel for the Plaintiff/Appellant.
Richard P. Ieyoub, Attorney General, G. Scott Vezina, Kathi Vernaci Logan, J. Marc Vezina, Special Assistant Attorneys General, Vezina and Gattuso, L.L.C., Gretna, Counsel for Defendants/Appellees.
Court composed of Chief Judge WILLIAM H. BYRNES, III, Judge CHARLES R. JONES, and Judge DENNIS R. BAGNERIS, Sr.
BYRNES, Chief Judge.
In this consolidated medical malpractice case, plaintiff, Lucinda Barth, representing Renee Hebert, appeals a judgment dismissing the plaintiffs claims against the defendants, State of Louisiana, Medical Center of Louisiana at New Orleans, Health Care services division, Charity Campus ("Charity"), Dr. Donald Parker, Dr. Laura G. Sporl, Dr. Kevin Plaisance and Dr. Leonard Wall. We reverse in part and render.
The plaintiffs motion to file closing jury instructions is denied because they are not part of the record and are without any authentication or certification by the trial court. We find in favor of the plaintiff without these additional jury instructions.

Facts
In March 1996 29-year-old Renee Hebert went to Charity's OB/GYN Clinic for surgery to treat her endometriosis, which caused pelvic pain. Her pre-operative chest x-ray revealed an abnormality. The radiologist recommended that she have a further x-ray or CT scan.
According to the defendants, Dr. Laura Sporl, the resident who performed the surgery discussed the abnormal findings with the patient prior to surgery. The plaintiffs assert that her treating physicians failed to notify Ms. Hebert of the abnormality and failed to schedule follow-up tests. After surgery she was discharged without complications.
Ms. Hebert returned to the out-patient OB/GYN Clinic at Charity for hormone therapy (Lupron) to prevent the return of *23 her endometriosis. The defendants acknowledge that apparently the in-patient chart was not forwarded to the out-patient clinic, thereby notifying the doctors to perform a follow-up chest x-ray. In June 1996, a routine no-contrast CT scan of Ms. Hebert's head, conducted at Doctor's Hospital as a precaution after she bumped her head in a minor accident, showed no abnormality.
In August 1996, Ms. Hebert went to Charity with complaints of seizure and disorientation. A CT scan revealed a 2cm tumor in the right side of her brain. Ms. Hebert was admitted to the hospital for a metastic work-up which showed that she had State IV lung cancer with metastasis to the brain. Options of non-invasive treatment (chemotherapy and radiation) and surgery (resection of her metastasis) were offered; however, instead of undergoing treatment, Ms. Hebert moved to Florida with her mother, Lucinda Barth, the plaintiff in this case.
In Pensacola, Florida Ms. Hebert underwent chemotherapy and radiation treatments at Sacred Heart Hospital but she refused to have surgery to remove her metastasis. Her treatments ended in November 1996, and she died in September 1997, thirteen months after her brain tumor was found (in August 1996).
The plaintiff filed two petitions: a petition for discovery (while the matter was pending before the malpractice review panel) and the malpractice suit. These matters were consolidated.
The medical review panel found that the failure to notify Renee Hebert of her abnormal chest x-ray and to do follow-up testing breached the medical standard of care.
The trial took place in March 1999. At the close of the plaintiffs case, the trial court granted the defendants' directed verdict with respect to Dr. Lewis Wall, and dismissed the claims against Dr. Lewis Wall, who was not present during the patient's operation in March 1996, and who never treated Renee Hebert.
The jury answered the jury interrogatories, and the trial court dismissed all the plaintiffs claims. The trial court denied the plaintiffs motion for judgment notwithstanding the verdict "JNOV", or alternatively, for a new trial and to vacate judgment. The plaintiffs appeal followed.
On appeal the plaintiff contends that the trial court erred in granting a JNOV to the defendants rather than a new trial under La. C.C.P. art. 1813. The plaintiff asserts that the defendants did not file a motion for JNOV, and the trial court cannot grant a JNOV sua sponte, in violation of La. C.C.P. art. 1811. The plaintiff also argues that the jury interrogatories were inconsistent and therefore this Court should conduct a de novo review or remand the matter for a new trial.

JNOV
The defendants did not file a motion for JNOV at the end of the trial, but the record does not show that the trial court intended to grant a JNOV. That wording is not used in the trial court's judgment after the jury rendered its verdict. The trial court must have concluded that (although the jury found the defendants at fault, assigned percentages of fault, and awarded the plaintiff $100,000 in damages for injuries or pain and suffering that would not have otherwise occurred if a defendant had performed follow-up testing after March 1996,) these awards could not be considered once the jury found that in March 1996 Renee Hebert had a brain tumor and no reasonable chance of survival from her cancer as set out in Interrogatories Nos. 4 and 5. Therefore the trial court dismissed all claims based on the trial court's interpretation *24 of the answers to the jury interrogatories rather than granting a JNOV. However, we disagree with the trial court's interpretation of the jury's answers to the interrogatories.

Interrogatories
At issue is whether the jury's answers to the interrogatories were consistent; whether Renee Hebert had any chance of survival that caused her life to be shortened, whether the defendants' malpractice caused her pain and suffering, and whether the trial court erred in dismissing the claims against the defendants based on the jury's answers to the interrogatories.
The jury answered the interrogatories in this case as follows:

INTERROGATORY NO. 1:
Did the plaintiff establish the standard of care ordinarily practiced by:
(a) a member of
 the staff
 and/or a
 resident
 within the
 speciality
 of obstretrics
 and
 gynecology YES x NO ___
(b) a hospital? YES x NO ___
If your answer is "Yes" to (a) or (b), proceed to Interrogatory No. 2. If "No," sign the form and return to the Court.

INTERROGATORY NO. 2:
If you answered No. 1(b) as "Yes," did Charity Hospital fail to use reasonable care or due diligence in accordance with the appropriate standard of care in its treatment of Renee Hebert?
 YES x NO ___
Proceed to Interrogatory No. 3.

INTERROGATORY NO. 3:
If you answered No. 1(a) as "Yes," did any of the following physicians fail to use reasonable care and due diligence in accordance with the appropriate standard of care in their treatment of Renee Hebert?
 (a) Laura Sporl YES x NO ___
 (b) Kevin
 Plaisance YES x NO ___
 (c) Donald
 Parker YES x NO ___
 (d) Any other
 physician YES x NO ___
If your answers to all parts of Interrogatories Nos. 2 or 3 are "No," sign the form and return to the Court. If your answer to any part of Interrogatory No. 2 or 3 is "Yes," proceed to Interrogatory No. 4.

INTERROGATORY NO. 4:
Do you find that the brain tumor found in August of 1996 in Renee Hebert was in her brain to any degree in March of 1996?
 YES x NO ___
Proceed to Interrogatory No. 5.

INTERROGATORY NO. 5:
Do you find that in March of 1996 Renee Hebert had a reasonable chance of survival from her cancer?
 YES x NO ___
Proceed to Interrogatory No. 6.

INTERROGATORY NO. 6:
Do you find that Renee Hebert suffered injuries or pain and suffering that would not have otherwise occurred if a defendant had performed followup testing after March 1996?
 YES x NO ___
Proceed to Interrogatory 7.

INTERROGATORY 7:
Please assign percentages of fault, if any, that apply to the following parties:

*25
(a) Charity Hospital 45 %
(b) Laura Sporl 20 %
(c) Donald Parker 30 %
(d) Kevin Plainsance 5 %
(e) Any other person ___ %
 TOTAL: 100 %

Your figures must equal 100% when added. Proceed to Interrogatory 8.

INTERROGATORY NO. 8:
What sum of money would reasonably compensate the plaintiff for the damages resulting from the death of Renee Hebert that would not have otherwise occurred?
 $ 100,000.00[1]
 New Orleans, Louisiana this 1 day of
April, 1999.
 ____________________________________
FOREPERSON
On April 1, 1999, the same date that the jury returned the jury interrogatories, the trial court entered a judgment dismissing all of plaintiff's claims. The plaintiff maintains that the jury instructions were inconsistent, and that this court should perform a de novo review.
A trial court has a duty to instruct the jury only on the law that pertains to the evidence adduced in that particular case. Barnett v. New Orleans Public Service Inc., 489 So.2d 452, 455 (La.App. 4 Cir.1986). To accomplish this duty, the trial court must both require that the jury consider only the correct law and avoid confusing the jury. Guilfore v. D.H. Holmes Co., Ltd., 93-0076 (La.App. 4 Cir. 1/13/94), 631 So.2d 491, writ denied, 94-0376 (La.4/4/94), 635 So.2d 1125. When the jury instructions contain plain, fundamental error, where the legal error is seen to have interdicted the factfinding process, a de novo review of the record is required. Jones v. Peyton Place, Inc., 95-0574 (La.App. 4 Cir. 5/22/96), 675 So.2d 754.
In the present case, Interrogatory 4 asked:
Do you find that the brain tumor found in August of 1996 in Renee Hebert was in her brain to any degree in March of 1996?
Interrogatory No. 5 asked:
Do you find that in March of 1996 Renee Hebert had a reasonable chance of survival from her cancer?
Interrogatory No. 2 asked if Charity failed to use reasonable care and due diligence under the appropriate standard of care in treating Renee Hebert. Interrogatory No. 3 lists the names of the physicians and asks whether they failed to use reasonable care and due diligence within the appropriate standard of care in their treatment of Renee Hebert. Interrogatory 3 stated at the end:
If your answers to all parts of Interrogatories Nos. 2 or 3 are "No," sign the form and return to the Court. If your answer to any part of Interrogatory 2 or 3 is "Yes," proceed to Interrogatory No. 4.
At the end of Interrogatory No. 5, it does not state that if the jury answered "No," the jury should sign the form and return to the Court. If that wording had been included, the trial court's interpretation of the jury's answer would have been reasonable. However, at the end, No. 5 states: "Proceed to Interrogatory No. 6."
A cause of action exists for a loss of a chance of survival in cases where there is a loss of a less than even chance of survival because of the alleged negligent treatment of a pre-existing condition. *26 Smith v. State of Louisiana, Dept. of Health and Hospitals, 95-0038 (La.6/25/96) 676 So.2d 543. This is distinguished from cases with more than a fifty percent chance of survival that are reviewed for the loss of life in wrongful death actions. Id. at 184. The plaintiff must prove by a preponderance of the evidence that the tort victim had a chance of survival at the time of the professional negligence and that the tort feasor's action or inaction deprived the victim of all or part of that chance, and must further prove the value of the loss chance which is the only item of damages at issue in such a case. Id. at 547. The jury considers the same evidence in a loss of a chance of survival case that would be considered by a jury in a survival and wrongful death action, and the jury computes whether or not any damages should be awarded for that loss of a chance of survival. Id. at 549.
In the present case, Interrogatory No. 5 asked: "Do you find that in March of 1996 Renee Hebert had a reasonable chance of survival from her cancer?" [Emphasis added.] In their brief, the defendants interpret that, by answering "No" to Interrogatory No. 5, the jury determined that "Renee Hebert was suffering from end stage lung cancer and did not suffer a loss of a chance of survival." However, the interrogatory does not refer to "end stage lung cancer." Furthermore, the plaintiff does not need to prove that the patient had a "reasonable" chance of survival as set forth in Interrogatory No. 5 in the present case.
In Smith v. State, Dept. of Health and Hospitals, id., the Louisiana Supreme Court stated:
... The court of appeal was correct in holding that plaintiff proved by a preponderance of the evidence that the negligence of the Department's physicians and employees deprived Smith of a chance of survival, a loss for which the Department must respond in damages. Hastings v. Baton Rouge Gen. Hosp., 498 So.2d 713 (La.1986). The court of appeal was also correct in holding that plaintiff were not required to prove a "reasonable" or "substantial" chance of survival. The issues in loss of a chance of survival cases are whether the tort victim lost any chance of survival because of the defendant's negligence and the value of that loss. The question of degree may be pertinent to the issue of whether the defendant's negligence caused or contributed to the loss, but such a tort-caused loss in any degree is compensable in damages. [Emphasis added.]

Id. at 546-547.
With respect to any loss of chance of survival, in Stroud v. Golson, 32-044 (La. App. 2 Cir. 6/16/99), 741 So.2d 182, certiorari denied, 99-2108 (La.10/29/99), 744 So.2d 1286, the Second Circuit explained:
In Smith v. State, 95-0038 (La.06/25/96), 676 So.2d 543, the supreme court recognized the right to recover damages for any lost chance of survival and set forth the method of valuation. In Smith, supra, x-rays showed a fast-acting cancer. The patient was released without being told of the findings. When the patient returned the next year, it was too late. The hospital admitted negligence but argued that the patient would have died anyway.
In Smith, supra, the supreme court held that when the chance of survival is less than 50%, the factfinder is "to focus on the chance of survival lost on account of malpractice as a distinct compensable injury and to value the lost chance as a lump sum award based on all the evidence in the record, as is done for any *27 other item of general damages." Id. at 547. The loss of less than an even chance of survival was found to be a distinct compensable injury to be distinguished from the loss of life in wrongful death cases which include scenarios in which the chances of survival are 50 % or greater.

Id. at 184.
In the present case, Interrogatory No. 5 was worded incorrectly as follows: "Do you find that in March of 1996 Renee Hebert had a reasonable chance of survival of her cancer?" [Emphasis added.] Following Smith, id, plaintiff is not required to prove that the patient had a reasonable chance of survival. If the plaintiff had to show that she had a reasonable chance of survival, it would mean that she had a more substantial chance of survival than if she had any chance of survival. Reading the jury interrogatories as a whole, we conclude that the jury answered "No" to Interrogatory No. 5, meaning that they found that she would not have survived, her death was inevitable, and she did not have a reasonable chance of survival. However, reading the jury instructions together as a whole with Interrogatory No. 5, and considering that the jury found fault and awarded damages, the jury found that although inevitably she would not survive, Renee Hebert experienced some loss of a chance of survival due to the defendants' malpractice.
Although Renee Hebert's cancer may have metastasized in March 1996, and she could not realistically hope for recovery, the jury concluded that Renee Hebert would have derived some benefit, and would have a somewhat-lengthened life expectancy if she were treated for cancer in March 1996. From the beginning, the jury determined that the hospital and its staff failed to use reasonable care and due diligence within the appropriate standard of care. The jurors also found that Renee Hebert suffered injuries of pain and suffering that would not have otherwise occurred if a defendant had performed follow-up testing beginning in March 1996. The jury further assigned percentages of fault and awarded $100,000 to compensate the plaintiff for damages.
We find that the jury's damage award compensated the plaintiff for her lost chance of survival. Because the defendants failed to give her the follow-up testing in March 1996, and her condition went untreated for several months, even though her condition was terminal, the jury concluded that she lost some chance of survival. Read as a whole, the jury instructions were not inconsistent and a review for manifest error is appropriate.

Causation
None of the experts gave Renee Hebert an even chance of survival. The parties provided contradictory evidence as to whether the defendants' failure to give her a follow-up x-ray and treat her for several months caused her to lose some chance of survival.
In Smith, supra, the Louisiana Supreme Court held that one of the factors that the jury may consider in determining the loss of a chance of survival is whether, although not likely to survive, the patient would have lived longer but for the malpractice. [Emphasis added.] Id., p. 11, n. 10, 676 So.2d at 549, n. 10.
The plaintiff need not prove that Ms. Hebert would have survived but for the defendant's malpractice; however, the plaintiff must establish by a preponderance of the evidence that she had a chance for survival and this chance was lost due to the defendants' negligence. Boudoin v. Nicholson, Baehr, Calhoun & Lanasa, 96-0363 (La.App. 4 Cir. 7/30/97), *28 698 So.2d 469. Causation is a question of fact and the trier of fact's determinations are entitled to great weight and cannot be disturbed absent manifest error. Anglin v. White, 572 So.2d 779 (La.App. 4 Cir. 1990); Alford v. Estate of Zanca, 552 So.2d 7 (La.App. 5 Cir.1989). Once a breach of duty constituting malpractice is established, the question of whether the malpractice contributed to the death, i.e., lessened the chance of survival, is a question of fact for the jury. Haynes v. Calcasieu Medical Transp., Inc., 97-300 (La.App. 3 Cir. 10/29/97), 702 So.2d 1024, writ denied, 98-0355 (La.3/27/98), 716 So.2d 888, and writ denied, 98-0360 (La.3/27/98), 716 So.2d 889. The jury as trier of fact is obligated to weigh the testimony of the witnesses to determine whether there was negligence and if so, who was responsible. Findings as to fault are factual and should be upheld on appeal unless clearly wrong. Garrett v. Celino, 489 So.2d 335 (La.App. 4 Cir.1986). Where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review. Virgil v. American Guarantee & Liability Ins. Co., 507 So.2d 825 (La.1987).
The defendants argue that Renee Hebert was suffering from Stage IV lung cancer at the time of the alleged failure to perform the follow-up x-ray, and any delay had no bearing on the outcome or survivability of Renee Hebert. We must review the expert testimony presented in this case to determine if there is any reasonable support for the finding that Ms. Hebert had a chance of survival in March 1996 but that she no longer had that same chance in August 1996.
Plaintiff's witnesses, Dr. Neil Wolfson and Dr. Ross Jacobson, were qualified as experts in obstetrics and gynecology. They agreed that there were two violations of the physicians and hospital's standard of care in treating Renee Hebert: (1) failure to discuss the abnormal chest x-ray with her in March 1996; and (2) failure to order follow-up tests at that time. Dr. Jacobson found that the only way the individual doctors, who were following up with the plaintiffs treatment, would know about the abnormal chest x-ray was if they pulled it from the hospital chart. Dr. Jacobson noted that the patient did not miss any appointments, and most of the sheets were marked "Chart not available" for the follow-up visits.
Plaintiff's witness, Dr. Brobson Lutz, qualified as an expert in medicine with special expertise in internal medicine and infectious diseases. Dr. Lutz agreed that the failure to set up follow-up testing recommended by the radiologist in March 1996 was a violation of the medical standard of care. He stated that internal medicine includes cancer staging based on the size of a tumor. Dr. Lutz opined that the March abnormal chest x-ray showed a relatively small tumor and was Stage I or II. Stage II is operable lung cancer. He referred to the June 30, 1996 CT scan of Renee Hebert's brain without contrast that showed that the test was normal. If the tumor had been big, he opined that the CT scan would have shown the tumor without contrast.
Dr. Lutz testified that Renee Hebert lost confidence in Charity. She was treated in Florida. When she went on a trip to Tennessee and New Orleans with her friend, Todd Wehner, she was in too much pain to go back to Florida. Dr. Lutz admitted Renee Hebert to Baptist Hospital in New Orleans on September 4, 1997. She wanted to return to Florida to be with her mother; however, when her mother was driving to New Orleans to pick up her daughter, Renee died on September 7, 1997. Dr. Lutz noted that the lung tumor did not show up on the chest x-ray when *29 she was admitted to Baptist just before her death.
The autopsy report showed that the lung lesion had shrunk down to less than one-half inch, and the expanding brain tumor actually killed her. When asked whether patients survive when they are timely treated, Dr. Lutz agreed that they can survive.
Dr. Lutz opined that Renee Hebert was in Stage I or II lung cancer. He noted that Renee Hebert had a single brain lesion and did not have multiple lesions. He found that in August 1996, Renee Hebert had a Stage IV adenocarcinoma of the lung. Dr. Lutz stated: "... the sooner you find any kind of cancer the easier it is to treat and the better the outcome is likely to be."
Plaintiff's witness, Dr. George B. Morris, III, was an expert in obstetrics and gynecology. He served on the medical review panel with Dr. Ross Jackson and Dr. Neil Wolfson. He related that the panel found that the defendants failed to comply with the appropriate medical standard of care but the panel was unable to answer the question of damages. He asserted that the problem existed with Charity's system of follow-up care of a patient, which involved a number of different doctors. Generally the doctor who ordered an x-ray has the responsibility to tell the patient of an abnormal finding. In the present case, Dr. Morris noted that probably Dr. Sporl was not involved in the preopt testing but she would have seen the chart and the abnormal chest x-ray when she performed the gynecological surgery on March 21, 1996. She should have notified the patient and should have talked to Dr. Parker, the doctor who next saw the patient, to order follow-up testing. Dr. Sporl had the obligation to find out who would be seeing the patient next and should have made a notation to the next doctor to follow-up with tests and talk to the patient about the x-ray.
On cross-examination, Dr. Morris acknowledged that the medical review panel could not answer whether the breach as to the hospital caused any harm to Renee Hebert. Dr. Morris agreed that Charity breached the standard of care by not having the chart made available with the follow-up clinic treating the patient after surgery for endometriosis.
Plaintiffs expert, Dr. Charles L. Brown, was qualified as an expert in oncology, hematology, and internal medicine. He stated that if the abnormal chest x-ray had been further evaluated in March 1996, it would have given Renee Hebert the best opportunity for either cure or long term survival. He referred to the theory of tumor doubling time that attempts to map out the growth rate of tumors, starting as one cell that doubles, and then those cells double, et cetera. He found a problem with the theory because it supposes that tumors are all a homogenous cell type, i.e. all tumor cells are exactly the same and grow at the same rate. Dr. Brown is not convinced that doubling time is a valid approach because tumors are heterogeneous with different growth propensities.
Plaintiff's witness, Dr. Michael Adinolfi, qualified as an expert in medicine with an expertise in surgery, including general surgery, vascular surgery, and thoracic surgery. Dr. Adinolfi could not tell the stage of cancer based on the abnormal chest x-ray alone. He could not tell if Renee Hebert had a brain tumor in March 1996 without the appropriate tests. Dr. Adinolfi assumed that untreated cancer for a period of time will grow. He agreed that probably the brain tumor was there in June 1996 although not detected in the CT scan without contrast, because the brain tumor could not grow as big as it did from *30 June 30, 1996 until August 18, 1996 (without having been present in June).
Defendant's witness, Dr. Laura Ginney Sporl, was an expert in obstetrics and gynecology, as well as general medicine. In March 1996 Dr. Sporl was a resident in training. Dr. Sporl had no independent recollection of the case. She testified that the residents had certain blocks of rotation with six-week rotations. The same-day surgery starts with the pre-opt done by the first team, that would order tests and see the patient in the clinic. That team would ready the patient for surgery. (In the present case, Dr. Treasure and Wooten were on the first team.)
The on-coming team would perform the surgery. They would only see charts the night before or the day of surgery. The head of the on-coming team would write the pre-opt note after reviewing the labs and looking at the x-rays. In the present case Dr. Sporl wrote the pre-opt note. In March 1996 Dr. Sporl was the fourth year resident, and Dr. Parker and Plaisance were the second and third residents on the on-coming team who performed the surgery for treatment of Renee Hebert's endometriosis.
Dr. Sporl was aware of the abnormal chest x-ray. Dr. Sporl met with the patient on the day of surgery. Generally she told all her patients about anything abnormal. As the fourth-year resident, Dr. Sporl would turn over the patients to the third-year, second-year and first-year residents. She would introduce the patient to the new doctor. Generally, the third-year resident managed gynecology patients. In the present case Dr. Donald Parker was the third-year resident who saw the patient in the clinic subsequent to surgery. Dr. Parker was present during the operation. After surgery, Dr. Sporl had no further contact with Renee Hebert.
Dr. Sporl's pre-opt notes in the chart stated: "Hysterscope, chromapebation. Risks and benefits were discussed with the patient who is aware and agrees and desires to proceed with above." On cross-examination by the plaintiff, Dr. Sport acknowledged that the team did not order follow-up tests. Dr. Sporl believed she delegated responsibility of setting up the follow-up tests to Dr. Parker. The chart was available to anybody in the operating room.
Dr. Mohamed Elmongy, testified on behalf of the defendants. He was qualified as an expert in oncology, hematology, internal medicine and general medicine. He is the director of the bone marrow and stem cell transplant program at Tenent's Medical Center ("Baptist Hospital") in New Orleans. He has a Ph.D. in nutritional biochemistry and training in statistics.
In his deposition dated November 12, 1998, Dr. Elmongy stated that the staging of the patient's cancer could not be determined by the abnormal March 1996 chest x-ray alone. He related that Stages I through IV were based on the progression of the disease with Stage IV being the last and most progressed stage. He declared that once the cancer moved from the lung to another organ, it had metastasized. Then the patient had Stage IV of the disease and could not be cured. Based on a two centimeter tumor found in Renee Hebert's brain in August 1996, Dr. Elmongy calculated that the brain tumor would have been .6 centimeters in February or March 1996. By definition, the patient had Stage IV cancer because it had metastasized from the lung to the brain. When asked if Renee Hebert would have lived longer if she had been appropriately treated in March 1996, Dr. Elmongy could not say. He asserted that it did not matter if *31 she lived longer because the quality of life becomes very poor.
During the trial, Dr. Elmongy could not tell from the chest x-ray alone that the tumor metastasized to the patient's brain in March 1996. He explained that the tumor doubling time theory was a very active science in the late 1960's and early 1970's. Dr. Elmongy related that a two or four centimeter sphere will not break off and move because it would kill the patient. It starts as one cell that metastasizes and travels via the blood stream or lymphatic stream to another organ. Dr. Elmongy declared that Renee Hebert's brain tumor would have been diagnosed as Stage III or IV if an MRI of the brain had been done. A Stage III patient would not have been a candidate for surgery but could be considered for surgical evaluation to see if the cancer spread to the lymph nodes. If there is cancer in the lymph notes, the surgeon will stop. Dr. Elmongy opined that the patient would still have the same problems with the treatments that she had in August 1996; radiation therapy and chemotherapy. The patient had adenocarcinoma that is the slower growing type of lung cancer. He stated that the patient would have no loss of a chance of survival between March and August 1996. He found that beyond a shadow of a doubt, Renee Hebert had brain metastasis in March 1996.
On cross-examination Dr. Elmongy agreed that the patient was a smoker. He acknowledged that he was aware of tumor cell heterogeneity where the tumor cells could be different and would grow at different rates. He noted that at different hospitals, each testing device was of different quality so that the June 1996 CT scan at Doctor's Hospital did not pick up the brain tumor without contrast although it was there in March 1996. The June 1996 CT scan without contrast did pick up swelling in the brain. Dr. Elmongy concluded that if the brain tumor had been found earlier and evaluated, it would not have mattered. It would not have affected the patient's chance of survival. Dr. Elmongy stated that weight loss does not happen until patients are desperately sick. He also stated that a cough and fatigue symptoms are nebulous.
Given the variances in the testimony outlined above, we cannot say the jury's decision in this case was unreasonable or unsupported. Although the experts agreed that the survival probabilities were extremely grim, the expert witnesses provided conflicting testimony concerning the loss of a chance of survival. The jury could conclude that there was some loss of her chance of survival because Renee Hebert would have benefited from treatment even though she had less than an even chance of survival. The jury could find that she may have had a longer period of time before she endured weight loss and other symptoms that Dr. Elmongy stated would not occur until she was desperately ill. In other words, although she would have suffered during the radiation and chemotherapy treatments regardless of when she underwent these treatments, she may have had a longer length of time of feeling normal before she would suffer the symptoms that would not occur until she was desperately sick at the end of her life. Renee Hebert's chance of survival would have been greater if she had been treated earlier. The jury was not clearly wrong in finding that the plaintiff showed that the defendants' inaction caused her some loss of a chance of survival.
We agree with the apportionment of fault assessed by the jury. Charity is responsible for its residency program where there was a change in the doctors who treated the patient, and Charity's chart was not made available to the out-patient *32 clinic. Charity bears the greatest fault, 45 percent, or greatest responsibility for causing the failure to notify the patient of the abnormal test results and to perform additional testing in March 1996.
The jury was not clearly wrong in finding that Dr. Parker was 30 percent at fault because he was the resident who was responsible for treating Renee Hebert after her operation, and it was up to him to order the follow-up testing. Dr. Parker had access to the patient's chart on the day of the operation and should have noted the abnormal chest x-ray.
The jury was not manifestly erroneous in finding that Dr. Sporl was 20 percent at fault where she knew about the abnormal chest x-ray but the chart does not show that she told the patient of the test result, although her usual procedure was to inform the patient. The jury could find that Dr. Sporl did not tell Dr. Parker to arrange for additional testing.
The jury was not clearly wrong in finding that Dr. Plaisance was ten percent at fault where he was a member of the operating team, had access to the patient's chart at the time of the operation, and should have noted the abnormal test result. He was partially at fault as he was part of the team that did the follow-up treatment. Accordingly, we agree with the jury's findings of fault.

Comparative Fault
The defendants contend that the plaintiff was comparatively at fault because she knew of the abnormal x-ray prior to her surgery to treat her endometriosis, and the patient did not advise the physicians or the hospital during her follow-up visits. The defendants assert that the physician performing the gynecological surgery, Dr. Laura Sporl, noted the abnormality in the x-ray and discussed the findings with Renee Hebert before the surgery.
The plaintiff points out that Dr. Sporl had no independent recollection of Ms. Hebert until she reviewed the medical records. Dr. Sporl was aware of the abnormal chest x-ray but she did not specifically remember whether she discussed the abnormal findings with Ms. Hebert. Dr. Sporl's usual practice was to discuss an abnormal x-ray with the patient, and the doctors' usual procedure at Charity was to note on the chart that the patient had been notified. In this case the chart contained no notation that the abnormal x-ray was discussed with Renee Hebert in March 1996.
The plaintiff, Lucinda Barth, testified that she was with her daughter, Renee Hebert, on the day of the out-patient surgery and during follow-up appointments at the clinic; however, Lucinda Barth testified that no one mentioned the abnormal chest x-ray or suggested further tests.
The jury did not assess fault to anyone other than Charity and the physicians who saw Renee Hebert. Therefore, the jurors did not find that Renee Hebert was comparatively negligent. The trier of fact is vested with assessing the witnesses' credibility. Where there are two permissible views of evidence, the fact finder's choice between them cannot be manifestly erroneous. Rosell v. ESCO, 549 So.2d 840 (La.1989). Dr. Sporl testified that she thought she told Renee Hebert of the abnormal x-ray in March 1996. She also testified that not everything is written on the chart. Lucinda Barth testified that she never heard anyone mention the abnormal chest x-ray, and maintained that Renee Hebert was not told of the abnormal findings. Further, it was not marked on the chart that the patient was told.
*33 Although Renee Hebert smoked, which contributed to her lung cancer, this does not show that she would not have incurred some lost chance of survival caused by the defendants' negligence. It is noted that the plaintiff refused to undergo surgery for treatment of her brain cancer in August 1996, and the surgery might have helped her condition. However, her decision to not undergo the surgery in August of 1996, when the odds were more stacked against her recovery, was justified. It would be reasonable for the jury to conclude that Renee Hebert would have opted for the treatment had the cancer been properly diagnosed in March 1996.
Considering the conflicting evidence, the jury's choice between them is not manifestly erroneous. We find that Renee Hebert was not comparatively at fault.

Quantum
As previously noted, if the tort feasor's action or inaction deprived the patient of all or part of that chance, the plaintiff must prove the value of the loss chance, which is the only item of damages at issue. Smith v. State of Louisiana, Dept. of Health and Hospitals, supra.
In Boudoin, supra, this court discussed the measure of damages for a lost chance of survival as follows:
Although the Smith opinion states that "full recovery is not available for deprivation of a chance of survival of less than fifty percent," 95-0038 at 7, 676 So.2d at 547, our primary guidance as to the proper measure of such damages is found in footnote ten of that opinion:
Evidence of loss of support, loss of love and affection and other wrongful death damages is relevant, but not mathematically determinative, in loss of a chance of survival cases, as is evidence of the percentage chance of survival at the time of the malpractice. The plaintiff may also present evidence of, and argue, other factors to the jury, such as that a ten percent chance of survival may be more significant when reduced from ten percent to zero than when reduced from forty to thirty percent. The jury may also consider such factors as that the victim, although not likely to survive, would have lived longer but for the malpractice. [Emphasis added.] 95-0038 at 11 n. 10, 676 So.2d at 549 n. 10.
It was emphasized, however, that the sole loss being valuated was the loss of chance, and that a lump-sum award should result.

Id., 698 So.2d at 476.
Damages awarded by a jury are to be reviewed in the light most favorable to the prevailing party. O'Riley v. City of Shreveport, 30,107 (La.App. 2 Cir.01/23/98), 706 So.2d 213 writ denied, 98-0752 (La.5/1/98), 718 So.2d 418. The discretion vested in the trier of fact is "great", and even vast in determining the amount of damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), certiorari denied, Maritime Overseas Corp. v. Youn, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). When damages are insusceptible of precise measurement, much discretion is left to the court for its reasonable assessment. La. C.C. art. 1999; Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976). The reviewing court must evaluate the particular injuries and their effects on the particular injured persons. Only after the appellate court determines that the trial court clearly abused its discretion in awarding damages to an injured party in a personal injury case, may the appellate court resort to looking at prior awards in cases with generically similar medical injuries for purposes of determining the highest or *34 lowest point at which damages are reasonable. Reck v. Stevens, 373 So.2d 498 (La. 1979). Youn, supra.
Applying these standards in the present case, after reviewing the award of damages in the light most favorable to the plaintiffs, we find no abuse of discretion in the jury's damage award. The $100,000 award was appropriate for the value of Renee Hebert's loss chance of survival, considering that Renee Hebert was deprived of some part of her chance of survival by the delay of treatment for several months, and she suffered additional emotional trauma in learning that her treatment was delayed for months because follow-up testing was not provided by the physicians and Charity in March 1996. Renee Hebert suffered a great deal of mental anguish from the hopeless condition with which she was faced, as well as the knowledge that she was not told of the abnormal chest x-ray and earlier detection was lost because follow-up testing was not done in March 1996.
Accordingly, we affirm the trial court's dismissal of all the claims against Dr. Lewis Wall. However, the original judgment of the trial court in favor of the other defendants, is reversed in part, and the jury verdict that allocated the percentages of fault to the physicians and Charity is substituted in this judgment as follows:

(a) Charity Hospital 45 %.
(b) Dr. Laura Sporl 20 %.
(c) Dr. Donald Parker 30 %.
(d) Dr. Kevin Plaisance 5 %.
 TOTAL: 100 %.

The plaintiff is awarded $100,000 in damages as allocated by the jury.
REVERSED IN PART & RENDERED.
PER CURIAM.
On rehearing, this Court's original opinion is amended to include the following sentence on the last page:
The trial court was clearly wrong in dismissing the plaintiff's claims, and the trial court abused its discretion in rejecting the jury's damage award.
In all other aspects, the original opinion remains unchanged.
NOTES
[1] The number 1,00,000.00 was crossed out and initialed "RD" by the foreperson.