# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 24-184


MICHAEL ACKMAN AND
JOSEPH F. ACKMAN, JR.

VERSUS

NEURO DIAGNOSTIC MONITORING, LLC
AND DAVID MOUTON


**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 20165533
HONORABLE KRISTIAN EARLES, DISTRICT JUDGE

**********

## WILBUR L. STILES
## JUDGE

**********

Court composed of Gary J. Ortego, Ledricka J. Thierry, and Wilbur L. Stiles, Judges.


**AFFIRMED. REQUEST FOR ADDITIONAL COSTS AND DAMAGES
FOR FRIVOLOUS APPEAL DENIED.**

**Todd J. Bialous**
**Attorney at Law**
**1100 Poydras St, Suite 2900 PMB 3423**
**New Orleans, LA 70163-2900**
**(504) 635-0105**
**COUNSEL FOR PLAINTIFFS/APPELLANTS:**
    **Michael Ackman**
    **Joseph F. Ackman, Jr.**


**Douglas K. Williams**
**K. Nicole Reynolds**
**Alexis N. Curtis**
**Breazeale, Sasche & Wilson, L.L.P.**
**One American Place, Suite 2300**
**Baton Rouge, LA 70821**
**(225) 381-8032**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
    **Neuro Diagnostic Monitoring, LLC**
    **David Mouton CNIM**
    **Medpro a/k/a The Medical Protective Company**
    **National Fire & Marine Insurance Company**
    **Medpro a/k/a The Medical Protective Company**

**STILES, Judge.**

Plaintiffs Michael Ackman and her now-former husband, Joseph Ackman, pursued a medical malpractice suit after Ms. Ackman developed bilateral vocal cord paralysis from an injury sustained during a thyroidectomy. Although Plaintiffs reached a settlement with the surgeon who performed the surgery, Plaintiffs pursued their suit against the intraoperative monitoring technician who was present at the surgery, as well as his employer. The trial court dismissed Plaintiffs' claim after a jury determined that Plaintiffs failed to establish the applicable standard of care. For the following reasons, we affirm the trial court's judgment. We deny Defendants' request for an award of additional costs, as well as their request for damages associated with the filing of a frivolous appeal.

### FACTS AND PROCEDURAL HISTORY

Due to painful sensations associated with an enlarged thyroid, Ms. Ackman underwent a subtotal thyroidectomy on August 31, 2015 at Our Lady of Lourdes in Lafayette. Dr. Henry J. Kaufman, a general surgeon and surgical oncologist, performed the procedure. Pertinent to this appeal, Dr. Kaufman utilized the services of Neuro Diagnostic Monitoring, LLC (NDM) to provide bilateral free run recurrent laryngeal nerve monitoring and identification in order to safeguard the nerves near the surgical site. David Mouton, a certified intraoperative monitoring technician employed by NDM, was assigned to provide the monitoring service during the procedure, which involved setting up the equipment, connecting wiring from NDM's laptop to the intubation tube in Mrs. Ackman's throat, and observing electromyography (EMG) activity from the patient's nerves through wave forms displayed on the laptop's screen. A supervising offsite physician likewise remotely monitored the EMG activity. According to Mr. Mouton, his role as the technician

was to inform the surgeon of EMG activity indicative of the surgeon encroaching on a nerve. Equipped with that information, the surgeon could then take additional safeguards to protect the patient's nerve.

Mr. Mouton's intraoperative monitoring is central to the present controversy as, following Dr. Kaufman's removal of Ms. Ackman's thyroid, Ms. Ackman developed bilateral vocal cord paralysis from an injury sustained during the procedure. The injury left Ms. Ackman with a host of complications, including difficulty swallowing, speaking, and breathing. She ultimately underwent a permanent tracheostomy. Given those conditions, she reported not only psychological difficulties, but she experienced difficulties in her career, social life, and marriage.

Although Mr. and Ms. Ackman have since divorced, they filed the petition instituting this medical malpractice claim in October 17, 2016, first naming Mr. Mouton and NDM as defendants. Both defendants were identified as "non-qualified" under the Medical Malpractice Act and, thus, Plaintiffs were not required to first proceed before a medical review panel. Plaintiffs alleged that Mr. Mouton was negligent in failing to identify harmful nerve activity during the thyroidectomy and, in turn, failing to alert Dr. Kaufman of that activity.

Plaintiffs contemporaneously pursued a complaint against Dr. Kaufman, a qualified healthcare provider, with the Louisiana Patient's Compensation Fund. After the completion of the Medical Review Panel process, Plaintiffs filed a first supplemental and amending petition, adding Dr. Kaufman and his insurer as defendants. Plaintiffs alleged that Dr. Kaufman failed to properly utilize the neuromonitoring services available to him, failed to utilize a nerve stimulator probe before transecting the thyroid, and failed to effectively communicate with Mr.

2

Mouton. Following a settlement, Plaintiffs voluntarily dismissed Dr. Kaufman and his insurer in January 2021.

After the dismissal of Dr. Kaufman, Plaintiffs pursued their claim against Mr. Mouton and NDM. Plaintiffs filed a second supplemental and amending petition, naming Mr. Mouton and NDM's insurers, MedProGroup a/k/a The Medical Protective Company and National Fire & Marine Insurance Company as defendants.

The matter proceeded to a multi-day jury trial in August 2023 where, as discussed below, the parties presented expert testimony regarding the standard of care applicable to Mr. Mouton and NDM. The jury found in favor of Defendants, simply responding "No" to an interrogatory inquiring whether "plaintiffs established, through expert testimony, the standard of care applicable to NDM and David Mouton[.]" The trial court signed a written judgment dismissing Plaintiffs' claims on August 31, 2023.

Plaintiffs appeal, assigning the following as error in their brief to this court:

(1) The jury legally erred or disregarded the law in rendering its verdict by ignoring the undisputed standard of care evidence offered by competent and unchallenged expert testimony at trial.

(2) The jury's verdict that Appellants had not proved the existence of the applicable standard of care by a preponderance of the evidence was manifestly erroneous as no competing evidence was offered to challenge the standard of care evidence offered by Appellants.

(3) The Trial Court erred in denying Appellants' request to include loss of chance of a better medical outcome as an alternative remedy on the verdict form.

(4) The Trial Court erred in denying the Appellants' motion *in limine* to exclude references to a settlement between the Plaintiffs and a former party-defendant and allowing such references at trial.

Defendants answer the appeal, requesting that this court modify the judgment to award them additional costs and to further award them attorney fees for frivolous appeal.

## DISCUSSION

*Burden of Proof*

The supreme court has explained that the plaintiff in a medical malpractice case has the burden of proving, by a preponderance of the evidence: "(1) the standard of care applicable to the defendant; (2) that the defendant breached that standard of care; and (3) that there was a causal connection between the breach and the resulting injury." *Samaha v. Rau*, 07-1726, p. 5 (La. 2/26/08), 977 So.2d 880, 883-84 (citing La.R.S. 9:2794). Further, "[e]xpert testimony is generally required to establish the applicable standard of care and whether or not that standard was breached, except where the negligence is so obvious that a lay person can infer negligence without the guidance of expert testimony." *Id.* at 884 (citing *Pfiffner v. Correa*, 94-924 (La. 10/17/94), 643 So.2d 1228).

On review, we are mindful that "[w]hether the plaintiff has met his/her burden is a question of fact, the resolution of which is subject to manifest error review and should not be reversed unless no factual basis exists for the finding and the record establishes the finding is clearly wrong." *Montz v. Williams*, 16-145, p. 1 (La. 4/8/16), 188 So.3d 1050, 1051 (per curiam).

*Standard of Care*

The jury in this case determined that Plaintiffs failed to establish the standard of care applicable to Defendants. Plaintiffs characterize as "uncontradicted" expert testimony that an intraoperative monitoring technologist participating in a surgery is required to report "all meaningful signal activity to the surgeon." Continuing,

Plaintiffs restyle the purported standard, suggesting that "simply put, when the surgeon is actively cutting and removing thyroid tissue: 'if you see something, say something.'"

Plaintiffs primarily rely on the testimony of their expert, Dr. Bryan Wilent, a PhD in neurology, suggesting that not only did he testify to the applicable standard of care, but that both Mr. Mouton and NDM owner and CEO, Brandon Landry, testified similarly. Plaintiffs assert that "[n]o testimony was presented to negate that this is the applicable standard nor to offer a different standard of care." Maintaining their position that the testimony was "uncontradicted," Plaintiffs contend that the jury "either ignored the law by not accepting an undisputed fact as true," or otherwise misunderstood the law as charged by the trial court. Either event, Plaintiffs argue, constituted legal error, interdicted the factfinding process, and requires *de novo* review. *Citing Hebert v. Parker*, 00-686 (La.App. 4 Cir. 5/23/01), 796 So.2d 19, *writ denied*, 01-2853 (La. 1/11/02), 807 So.2d 237.

We find no merit in Plaintiffs' position. In their appellants' brief and in their reply brief, Plaintiffs contend that they established that a technologist must report "all *meaningful* signal activity to the surgeon." (Emphasis added.) The record, however, reveals that Plaintiffs did not present the jury with such a precise standard. Notably, the term "meaningful" was absent from their characterization of the standard of care. They instead suggested a less qualitive standard, *i.e.*, "if you see something, say something."

Dr. Wilent explained that "technologists are not qualified to decipher or interpret" the "signals" produced on the technologist's EMG monitors. Rather, interpretation of the signals is left to the supervising offsite physician. As for how those "signals" impact the standard of care, the following colloquy between

Plaintiffs' counsel and Dr. Wilent evidences the vague guidance presented to the jury:

> Q. So if a tech sees activity on the monitoring, what are they required to do?
>
> A. Communicate, communicate, communicate. That's their job. Th[eir] job is to make sure everybody involved with the care of that patient, the professional in the case, the surgeon, the anesthesiologist, is aware of that activity.
>
> Q. If you see something, say something. Is it as simple as that?
>
> A. It's pretty simple, yes. See something, say something.
>
> Q. If there's a need for interpretation, what happens?
>
> A. If there's a - - if there's a signal, it needs to be interpreted. It needs to have context within the surgery, and everybody needs to be aware. So you talk to the professional on the case. You inform the surgeon. The surgeon has the information of what they're doing. They say oh, I just pulled right here. You can talk to the anesthesiologist, you know, what's going on? Did you do anything from an anesthesia standpoint, just changed something? When everybody is communicating, that's when you can  - they can come up with why we are getting this activity, and everybody is going to have their own perspective and context, and that group context is where you make that collective decision.

Despite Plaintiffs' characterization in their brief, Dr. Wilent did not couple "activity" with "meaningful" or differentiate reportable activity from unreportable activity.

In contrast, the defense presented the jury with a more clearly defined role for the intraoperative monitoring technologists and how technologists are to respond to EMG tracings throughout the procedure. For instance, Mr. Landry, accepted as an expert in intraoperative neuromonitoring with respect to the role of a technologist, stated that although a technologist does not "interpret" a waveform, a technologist is trained to look at the EMG strip and determine if it is indicative of "true nerve activity" or whether it shows "non-meaningful activity." Mr. Landry explained that a technologist does not report the latter.

6

Similarly, Mr. Mouton, qualified as an expert in intraoperative monitoring from the technological standpoint, testified that he was trained to read whether "feedback" on an EMG strip is indicative of "true nerve activity" or not.[1] As did Mr. Landry, Mr. Mouton testified that he does not notify the surgeon of non-meaningful activity but that he instead notifies the surgeon of "true nerve activity."

Likewise, and although he did not speak specifically to the standard of care owed by the technician, Dr. Gervais, the Board Certified neurologist who acted as the supervising offsite physician in this case, spoke generally to the differentiation of "activity" from the type of activity that warrants reporting. In particular, he explained that the reporting of information that is "not pertinent" can be distracting during the procedure.[2]

This type of differentiation between "activity" and that which is "meaningful" was absent from Dr. Wilent's testimony. Plaintiffs' suggest that Dr. Wilent "clarified" on cross-examination that activity must be "meaningful." Reference to passages cited from Dr. Wilent's deposition, however, only reveals the sharp contrast between the more general framing of the standard of care by Plaintiffs and the more nuanced standard of care advanced by Defendants.

On questioning by defense counsel, Dr. Wilent responded:

Q.     Okay. Let's talk about it, and maybe I'm using this terminology wrong, so let me know. When I say activity versus true nerve activity, do you know what I mean by that? Like that there is activity that can be picked - - do you agree with me that there's activity that can be picked

---

[1] Although perhaps directed toward the issue of breach of the standard of care, it is worth noting that Mr. Mouton testified that had he identified true nerve activity, such as "bursts" or "spikes," he would have informed Dr. Kaufman. At no time did he identify any "true nerve activity," nor did he identify "meaningful activity."

[2] Dr. Gervais testified that he could not recall any "true nerve activity" during the procedure, but that had he done so, he would have recorded the activity and alerted Mr. Mouton. Dr. Gervais explained that his report contained only "standard boilerplate" language.

up during a thyroidectomy that's not indicative of true nerve activity of the surgeon being in proximity to the recurrent laryngeal nerve?

A.   No.

Q.   Maybe what about, I think - -

A.   I don't understand.

Q.   What about meaningful versus non-meaningful activity? I believe in one of your prior depos we talked about that there can be, there's meaningful activity and there's non-meaningful [ ] activity. Do you know what I mean by that?

A.   Well, in this case all activity was meaningful.

Q.   Okay. What I'm – I guess what I'm trying to ask you is do you agree that like the surgeon can pull on the thyroid gland and it could be, it could show some activity but it wouldn't necessarily be indicative of nerve - - of activity you're concerned about, about being in the vicinity of the nerve.

A.   Well, I mean, that would be the surgeon. When I tell them there's activity, they'll be like, well, let me look; am I in the vicinity of the nerve or did I just pull on the whole neck, but only the surgeon can know when they're informed about the activity, you know, okay, now I'm going to reassess where the nerve is potentially.

I'm looking at the activity. I don't know where the nerve is. I don't know where the thyroid is or where the surgeon is. All I know is I see activity, I let the surgeon know, and they make the determination of like, okay, the nerve was manipulated, where is it.

As seen, Dr. Wilent continued to generally refer to "activity," without concession to a qualitative measure for reporting.

Finally, Plaintiffs' position that the experts' testimony on the standard of care was uncontradicted is undermined by reference to the closing arguments. Plaintiffs' counsel stated:

Bryan Wilent said when you are the technologist and you are providing this service, you are the eyes and you are the speaker. You are the one that if you see something, you say something.

He talked in the very beginning, and he's trying to understand how this is supposed to go I-O-N-M, install, set the equipment up right,

have it in the room, make sure it is working, because you've got to receive the signals. O, observe. Watch. That's our only job is to sit there and stare at the screen. Watch. What are you watching for? Changes. Because as Dr. Wilent told us, *activity is activity*, especially in thyroidectomies. It's a very sensitive procedure. And notify. When in doubt, call it out. Only when you have those two things do you actually have true monitoring services being provided to the surgeon. It's as simple as that. *That is the standard of care of Intraoperative Neuromonitoring Services. If you see something, say something*.

. . . .

So this one is an easy one. Did we establish through expert testimony the standard of care? And the defense don't dispute this. They agree. *When you see activity, it needs to be reported.*

(Emphasis added.)

Yet defense counsel pointedly refuted the suggestion that the parties agreed as to the standard of care. Counsel instead described in sharp relief the difference between Plaintiffs' position and Defendants' contention that the standard of care required the reporting of "meaningful" or "true nerve" activity. Defense counsel explained:

So he also told you in opening, and he reiterated it in closing, standard of care is if you see something, you report it. If it's not a flat line, you report it. It doesn't matter if it's a squiggly line. It doesn't matter what it is. Dr. Kaufman, and everybody who actually does these procedures said, "No, I don't want you talking to me every time there's a blip on the system. No, I don't want to know every time there's something. I want to know about the things that are important, the things that are meaningful."

. . . .

So according to Wilent, I don't even know why Wilent went into a discussion about the different waveforms that he believes the beds and the lights and everything else show, because if you're going to report everything - - if you are a technician in the room, and according to them, you have no judgment. You plug it in, you look at the monitor and go "blip, blip, squiggle." That's what they seem to think that the technician is supposed to do, forget all their training, forget the training they've had, forget the experience, forget their ability to recognize what is a significant and meaningful signal. No, just pepper the doctor the whole procedure. The doctor, who is trying to focus on a hole this big

9

(indicating) dealing with nerves that are maybe the size of a hair or smaller. But no, we want your technician to pepper him with everything. . . . I think it's pretty clear from everybody, no, we don't want to distract the doctor, we don't want to, and so they can't make up their mind do they want us to exercise judgment or do they just want us to go "blip, blip, dot, blip, dot, squiggle?" . . . .

So what is the standard of care? . . . These are trained professionals. Those trained professionals have to be able to recognize what is a meaningful signal. What is a real signal? What is one that tells you you have true nerve activity? That's what the standard of care is.

Plaintiffs' counsel offered no redirection or redefining of its argument regarding standard of care in its rebuttal argument.

Thus, the record does not support Plaintiffs' contention that the opinions of Dr. Wilent, Mr. Landry, and Mr. Mouton were in accord. Whether confused by the ill-defined "if you see something, say something standard" or whether the jury more fully accepted Defendants' standard involving the reporting of "true nerve activity," the jury simply responded "No" to the foundational question of whether "*plaintiffs have established*, through expert testimony, the standard of care applicable to NDM and David Mouton?" (Emphasis added.) We leave that determination undisturbed.

Nonetheless, it merits pointing out that even had Dr. Wilent's testimony been uncontradicted, the jury was not bound to accept that testimony as Plaintiffs suggest. Rather, "[t]he rule that questions of credibility are for the trier of fact applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound." *Lirette v. State Farm Ins. Co.*, 563 So.2d 850, 853 (La.1990). This court has explained:

Generally, "uncontradicted expert testimony should be accepted as true in the absence of circumstances in the record that cast suspicion on the reliability of the testimony." *Arnold v. Town of Ball*, 94-972, p. 8 (La.App. 3 Cir. 2/1/95), 651 So.2d 313, 319. However, "'[e]ven uncontradicted expert testimony is not binding on the factfinder.'" *Prestridge v. Bank of Jena*, 05-545, p. 18 (La.App. 3 Cir. 3/8/06), 924 So.2d 1266, 1278, *writ denied*, 06-0836 (La. 6/2/06), 929 So.2d

1261(quoting *Penton v. Healy*, 04-1470, p. 4 (La.App. 4 Cir. 1/26/05), 894 So.2d 537, 540, *writ denied*, 05-0975 (La. 6/3/05), 903 So.2d 463). The factfinder has discretion to accept or reject expert testimony and to determine the amount of weight it may be due, which is largely dependent upon the expert's qualifications and the facts upon which their opinions are based. *Id.* Further, as explained by the Louisiana Supreme Court, "[t]he trier of fact may substitute common sense and judgment for that of an expert witness when such a substitution appears warranted on the record as a whole." *Ryan v. Zurich Am. Ins. Co.*, 07-2312, p. 12 (La. 7/1/08), 988 So.2d 214, 222.

*Breaux v. Woods*, 20-161, pp. 3-4 (La.App. 3 Cir. 11/18/20), 307 So.3d 395, 400.

Respecting the jury's role as factfinder, we find no merit in Plaintiffs' argument that the jury legally erred or in its alternative argument that the jury was manifestly erroneous in finding that they did not establish the standard of care. The record instead supports its decision, and we affirm below the trial court's judgment in favor of Defendants.

*Loss of Chance of Survival*

Resolution on the standard of care issue renders moot Plaintiffs' derivative claim that the trial court erred in denying their request to include loss of chance of a better medical outcome as an alternative remedy on the verdict form.

*Motion in Limine*

In their final assignment of error, Plaintiffs question the trial court's denial of their motion in limine to exclude references to a settlement between Plaintiffs and Dr. Kaufman. Plaintiffs maintain that the settlement of claims is inadmissible to prove liability in the same case. *Citing* La.Code Evid. arts. 408 and 413; *Rayburn v. State Farm Mut. Auto. Ins. Co.*, 21-160 (La.App. 3 Cir. 11/10/21), 330 So.3d 709. They argue that there is no other purpose to offer references to a settlement with another party in this claim other than to suggest that party's liability, which is prohibited, or worse, to suggest that Plaintiffs have already been adequately

11

compensated for their injuries. Plaintiffs maintain that the references at trial to the prior settlement with Dr. Kaufman unfairly prejudiced them on both liability and damages. They contend that the failure to exclude the statements represents an error of law requiring a reversal of the jury's verdict and a *de novo* review by this court. We find no merit in Plaintiffs' position.

Louisiana Code of Evidence Article 408[3] excludes evidence when offered for the purpose of proving liability for, or invalidity of, the claim or its amount. Here, as the trial court pointed out in its denial of Plaintiffs' motion in limine, the jury was asked to assess fault between the various actors, including Dr. Kaufman. The trial court thus ruled that "within reason [the settlement] can be talked about." We find no error in the trial court's direction and further find that the parties did not stray from that direction.

Defendants called Dr. Kaufman to the stand to testify regarding his own role in the surgery. He did not discuss either his own liability or Defendants' alleged liability within the context of the settlement. In fact, Dr. Kaufman made only scant reference to the settlement on prompting by Plaintiffs' counsel as seen in the following exchange:

> Q. Doc, I think I'm going to wrap it up here. You acknowledge that you were the one with the scissors in your hand, right?

---

[3] Louisiana Code of Evidence Article 408(A) provides:

In a civil case, evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, anything of value in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This Article does not require the exclusion of any evidence otherwise admissible merely because it is presented in the course of compromise negotiations. This Article also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

A. Correct.

Q. And that you were the one that physically, either by traction, pulling or by cutting, physically caused the injuries, right?

A. Yes.

Q. And you accepted that?

A. Yes.

Q. And we made our peace, right?

A. Yes.

This reference in no way touches upon Plaintiffs' claim of liability against Defendants and is entirely devoid of any terms of the settlement. *See e.g.,* La.Code Evid. art. 413 (providing that "[a]ny amount paid in settlement or by tender shall not be admitted into evidence unless the failure to make a settlement or tender is an issue in the case.").

Accordingly, we do not find that Plaintiffs have demonstrated either error or prejudice in the trial court's denial of the motion in limine.

*Answer to the Appeal*

We next turn to Defendants' Answer to the appeal by which they, in part, seek damages for frivolous appeal. *See* La.Code Civ.P. arts. 863 and 2164. We do not find the requested damages are warranted in this case. Although La.Code Civ.P. art. 2164 allows for an award of "damages, including attorney fees, for frivolous appeal[,]" the measure is penal in nature and must be strictly construed. Those damages are warranted only when there is no serious legal question, when the appeal is taken solely for delay, or when it is apparent that counsel does not seriously believe in the position he advocates. *Girouard v. Summit Fin. Wealth Advisors, LLC*, 20-261 (La.App. 3 Cir. 3/24/21), 318 So.3d 231, *writ denied*, 21-560 (La. 6/22/21),

318 So.3d 710. While Plaintiffs are unsuccessful in this appeal, we do not find the serious legal issues are so lacking as to indicate that counsel does not seriously believe in the position advanced.

Finally, we do not address Defendants' further request in their Answer that the judgment be modified to include additional costs incurred at trial. These particularized costs were addressed by the trial court in the November 17, 2023 judgment rendered subsequent to the August 31, 2023 judgment on the merits reviewed herein. Plaintiffs have separately appealed from the November 17, 2023 judgment and this court has lodged that appeal as Docket Number 24-214. Defendants have Answered that appeal re-urging their request for additional costs incurred at trial. Finding it appropriate to review the parties' respective claims under the November 17, 2023 judgment in reference to one another, we do not address Defendants' claim here.

## DECREE

For the foregoing reasons, the trial court's August 31, 2023 judgment is affirmed. Defendants/Appellees' request for additional costs and damages for frivolous appeal is denied. Costs of this appeal are assigned to Plaintiffs/Appellants.

**AFFIRMED. REQUEST FOR ADDITIONAL COSTS AND DAMAGES FOR FRIVOLOUS APPEAL DENIED.**